**THREE AFFILIATED TRIBES OF the FORT BERTHOLD RESERVATION,**
Plaintiff and Appellant,

v.

**WOLD ENGINEERING, P.C., a North Dakota Professional Corporation, Defendant, Third-Party Plaintiff and Appellee,**

v.

**SCHMIT, SMITH & RUSH,**
Third-Party Defendant.

Civ. No. 10172.

Supreme Court of North Dakota.

March 13, 1985.

As Amended March 21 and April 1, 1985.

John O. Holm, argued, Dickinson, and Raymond Cross, New Town, for plaintiff and appellant.

Gary H. Lee, Minot, argued, Bosard, McCutcheon & Rau, Minot, for defendant, third-party plaintiff and appellee.

Pringle & Herigstad, Minot, for third-party defendant; did not participate.

ERICKSTAD, Chief Justice.

On July 1, 1982, this Court, in a unanimous opinion, affirmed the judgment of the District Court of Ward County. Three Affiliated Tribes of the Fort Berthold Indian Reservation (Affiliated) had appealed from a judgment of that court dismissing the complaint for lack of subject matter jurisdiction. The basic issue on appeal was whether or not the state court had subject matter jurisdiction over a civil action arising within the exterior boundaries of the Fort Berthold Indian Reservation in which Affiliated was the plaintiff and the defendants were non-Indians. *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, P.C.,* 321 N.W.2d 510 (N.D.1982).

Following an application for a writ of certiorari from the United States Supreme Court, that Court granted the writ, received briefs from the parties, heard arguments of counsel, and on a seven-to-two basis on May 29, 1984, vacated the judgment of our Court and remanded the case for further proceedings not inconsistent with its opinion.

In its opinion, the majority, speaking through Mr. Justice Blackmun, said:

"In sum, then, no federal law or policy required the North Dakota courts to forgo the jurisdiction recognized in *Vermillion* [*v. Spotted Elk*, 85 N.W.2d 432 (N.D.1957)] in this case. If the North Dakota Supreme Court's jurisdictional

ruling is to stand, it must be shown to rest on state rather than federal law.

\* \* \* \* \* \*

"If the state court has proceeded on an .incorrect perception of federal law, it has been this Court's practice to vacate the judgment of the state court and remand the case so that the court may reconsider the state law question free of misapprehensions about the scope of federal law.

"Here, a careful reading of the North Dakota Supreme Court's opinion leaves us far from certain that the court's present interpretation of Chapter 27–19 does not rest on a misconception of federal law. In determining the role played by that court's understanding of federal law, we are guided by the jurisdictional principles that have come to govern our calculation of adequate and independent state grounds. In *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), this Court ruled that 'when ... a state court decision fairly appears ... to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so.' *Id.,* at ——, 103 S.Ct., at 3476. Although petitioner's constitutional challenge to the North Dakota Supreme Court's judgment means that we do not face a question of our own jurisdiction, *see Standard Oil Co. v. Johnson,* 316 U.S., [481] at 482–483, 62 S.Ct., [1168] at 1169 [86 L.Ed. 1611 (1942)], we believe that the same general interpretive principles properly apply here. The North Da-

kota Supreme Court's opinion does state that the North Dakota Legislature 'totally disclaimed jurisdiction over civil causes of action arising on an Indian reservation,' but it adds that the legislature did so 'pursuant to Public Law 280,' '[u]nder the authority of Public Law 280,' and 'under explicit authority granted by Congress in the exercise of its federal power over Indians.' 321 N.W.2d, at 511–513." *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, P.C.,* —— U.S. ——, ——, 104 S.Ct. 2267, 2276–77, 81 L.Ed.2d 113, 124–25 (1984).

In essence, what the United States Supreme Court is telling us is that the courts of our state have jurisdiction to try this dispute, because jurisdiction was acquired through the exercise of jurisdiction prior to the amendments of Public Law 280 by Congress in 1968, notwithstanding the contract between the United States and North Dakota created by Section 4, subdivision 2, of the Congressional Enabling Act, passed February 22, 1889,[1] and the second part of Section 203 of Article XVI of the North Dakota Constitution as it read before amendment in 1958.[2]

In other words, the Court is saying that by exercising jurisdiction in *Vermillion v. Spotted Elk,* 85 N.W.2d 432 (N.D.1957), a case involving a tort action brought by an Indian against another Indian, arising out of an automobile accident which occurred on a highway within the exterior boundaries of an Indian reservation in this state, our state courts acquired jurisdiction which was not affected by the amendments to Public Law 280 in 1968 by the enactment of the Indian Civil Rights Act (Pub.L. 90–284, §§ 401, 402, 406, 82 Stat. 78–80, codified at 25 U.S.C. §§ 1321, 1322, 1326),[3] notwith-

---

**1.** "Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States." Enabling Act of Feb. 22, 1889, § 4, cl. 2, 25 Stat. 676.

**2.** "The people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title

thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and that said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States;" N.D. Const. art. XVI, § 203 (1889).

**3.** "Assumption by State of Civil Jurisdiction

"Sec. 402. (a) The consent of the United States is hereby given to any State not having

standing that Section 1322 required the consent of the tribe occupying the particular Indian country, notwithstanding that in *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), the United States Supreme Court said that the Supreme Court of Arizona had no jurisdiction over an action on a debt arising on the Navajo Reservation, brought by a non-Indian against an Indian couple, and notwithstanding that the reasoning applied in *Vermillion*, that the Congressional Enabling Act and the disclaimer in Section 203 of Article XVI of the North Dakota Constitution did not constitute a reservation by the United States of exclusive jurisdiction over civil causes of action between Indians residing on the reservation, if the actions did not involve Indian lands, has been criticized as faulty.

In light of the mandate of the Supreme Court in this case, our first task on remand appears to be to determine the meaning of Chapter 27–19, N.D.C.C., the Indian Civil Jurisdiction Act enacted on March 2, 1963, by our state legislature.

We are reminded that in so doing we have in the past construed state statutes: "[T]o avoid potential state and federal constitutional problems, see, *e.g.*, *State v. Kottenbroch*, 319 N.W.2d 465, 473 ([N.D.]1982); *Paluck v. Board of County Comm'rs*, 307 N.W.2d 852, 856 ([N.D.]1981); *Grace Lutheran Church v. North Dakota Employment Security Bureau*, 294 N.W.2d 767, 772 ([N.D.]1980); *North American Coal Corp. v. Huber*, 268 N.W.2d 593, 596 ([N.D.]1978); *Tang v. Ping*, 209 N.W.2d 624, 628 ([N.D.]1973)." — U.S. at —, 104 S.Ct. at 2278, 81 L.Ed.2d at 126.

Although we normally would not attempt to construe a statute unless it were ambiguous, and an ambiguity in Chapter 27–19 is not obvious on its face, because the United States Supreme Court is of the view that we may have been influenced in our decision as to both its meaning and its constitutionality because of our erroneous view of Public Law 280 and its amendments, we shall in this case attempt to determine the meaning of Chapter 27–19 through a study of the legislative history of that chapter.

It is interesting to note that Chapter 27–19 resulted from an interim study of the North Dakota Legislative Research Committee conducted in the interim between the 1961 and 1963 legislative sessions.

The report to the Thirty-eighth Legislative Assembly (the 1963 session of the Legislature) discloses that a subcommittee on Indian affairs was appointed pursuant to passage of Senate Concurrent Resolution "R–R" and House Concurrent Resolution "T–1" of the Thirty-seventh Legislative Assembly. A review of the report to the Thirty-eighth Legislative Assembly discloses the care in which the subcommittee acted.[4]

---

jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State." Pub.L. 90–284, § 402(a), 82 Stat. 79, codified at 25 U.S.C. § 1322(a).

**4.** "Although much has been said about reservation problems at numerous conferences and meetings, and even on the floors of the Legislative Assembly, the Committee decided to begin its work by obtaining thorough, first-hand information about Indian law enforcement, education, health, and welfare problems directly from the Indian citizens themselves.

"A series of hearings was therefore held on all reservations in all Indian counties in the State. The hearings and meetings followed the pattern of meeting at the county seat with representatives of the counties and cities, law enforcement officials, juvenile commissioners, and interested citizens—plus such Indian citizens from the areas as might choose to attend. The Committee would then shift its hearing to a location on the reservation that would be more convenient for the attendance of Indian citizens, and all residents of the reservation as well as representa-

It is particularly interesting to note that in Part III of the report of the full legislative research committee to the Legislature, the assertion is made under part 1(i) that the assumption of civil jurisdiction by the state would provide, among other things, a tool for the accomplishment of eleven different objectives, including enforcement of contracts between Indians and non-Indians and providing a tribunal for trying tort actions.[5]

The bill prepared by the full legislative committee to accomplish the objectives as they related to civil jurisdiction was Senate Bill 30. This bill as originally introduced consisted of only six sections. The main section was Section 1 whereby the state was to *unilaterally* accept exclusive jurisdiction over all civil causes of action which arise on Indian reservations.[6]

When the bill was first considered by the State and Federal Government Committee to which it had been referred, Representa-

tives of the Bureau of Indian Affairs were invited to attend. Such meetings and hearings were held at the cities of Rolla and Dunseith in Rolette County and at Belcourt on the Turtle Mountain Indian Reservation; at Parshall and New Town in Mountrail County; at Halliday and at the Twin Butte School in Dunn County for the Fort Berthold Reservation; at Fort Yates in Sioux County for the Standing Rock Reservation; at Minnewaukan in Benson County and at Fort Totten for the Fort Totten Reservation.

"All of these hearings were well attended and in every instance residents of the reservations, local officials, and interested citizens spoke freely and frankly. At several of the hearings the interest was so high that it was necessary for the hearings to be continued for several hours past their scheduled time for adjournment.

"The Committee recognized from the beginning that the responsibility for government on the reservations and the provision of governmental services is in fact a partnership affair. While the historic and legal responsibility for most of the normal services of government rests with the United States, by treaty and by congressional act, the Federal Government has delegated substantial authority to tribal governments, and over the years the State of North Dakota and its political subdivisions have provided substantial governmental services, especially in the field of welfare. In view of the divided responsibility for reservation government and governmental services, it was obvious to the Committee that State action alone could not affect all areas in which serious problems exist. In addition, there is much confusion as to which level of government has the responsibility for certain functions or services, or even which level of government might have jurisdiction to offer services.

"Following a number of Committee meetings and the series of hearings described earlier in this report, the Committee decided that its report and recommendations should not be limited to only those areas in which the State might have authority to take action, but should view the matter as a whole, delineate the problems, and suggest the areas in which the Federal, tribal, or State governments should be active, and recommend specific action by each level of

government." Report of the North Dakota Legislative Research Committee, Thirty-eighth Legislative Assembly, Indian Affairs 1963, at 31.

5. "i. The assumption of civil jurisdiction by the State would provide, among other things, a tool for:
   1. Determining the parentage of children;
   2. Enforcing support by the head of the household for the wife, children, or dependents;
   3. Placement of children in foster homes, both on and off the reservations;
   4. Termination of parental rights and provisions for adoption of Indian children;
   5. Providing institutional custody and rehabilitation services for juvenile delinquents in some instances;
   6. Handling divorces and other matters affecting mixed marriages;
   7. Involuntary commitment of mentally ill Indians to mental institutions;
   8. Enforcement of contracts between Indians and non-Indians;
   9. Providing a tribunal for trying tort actions (wrongful injuries to persons or property);
   10. Permitting the service of civil process upon reservations by State authorities;
   11. Providing a tribunal for the settlement or trial determination of many types of actions too numerous to mention." Report of the North Dakota Legislative Research Committee, Thirty-eighth Legislative Assembly, at 36.

6. "SECTION 1.) In accordance with the provisions of Public Law 280 of the 83rd Congress and Section 203 of the North Dakota Constitution, the state of North Dakota hereby accepts and shall have exclusive jurisdiction over all civil causes of action which arise on Indian reservations or in Indian country to the same extent that the state has jurisdiction over other civil causes of action, and those civil laws of this state that are of general application to private persons or private property shall have the same force and effect within such Indian reservations or Indian country as they have elsewhere within this state." Senate Bill 30, Thirty-eighth Legislative Assembly.

tive Harold Hofstrand, the chairman of the subcommittee on Indian affairs of the Legislative Research Committee which had conducted the interim study, appeared before the Senate State and Federal Government Committee to request that a hearing be set to which should be invited the Indian tribal chairmen and the members of the Indian Affairs Commission.

When the public hearing was held, a number of Indian leaders, both within and without the State of North Dakota, appeared to oppose the passage of the bill, some asserting that civil jurisdiction should not be assumed by the state without a vote of the Indian people [7] and, apparently, as a result thereof, the bill was amended to provide for acceptance of civil jurisdiction by the state upon acceptance by the Indian citizens as provided in Sections 2 and 5 of the bill as it finally passed the Legislature.[8]

■ In light of this background and the seeming intent of the Legislature to accommodate the will of the Indian people in Section 2 (§ 27–19–02, N.D.C.C.), and the will of the individual Indian in Section 5 (§ 27–19–05, N.D.C.C.), to accept state jurisdiction, even to the extent of providing for a means of the Indian people in Sections 11 and 12 and the individual Indian in Section 13 (§§ 27–19–11, –12, –13, N.D.C.C.), for withdrawing from state civil jurisdiction, and further in keeping with our policy of construing a statute to uphold its constitutionality against either state or federal constitutional attack, we conclude that the Affiliated Tribes in this case may prop-

7. "Marvin Sonosky, 1700 K St., Washington, D.C., representing Standing Rock Indian reservation, spoke against passage of the bill. He said there were only four Indians on the Indian Commission and that wasn't enough. He believed it was only local merchants concerned about collecting debts. President Eisenhower signed a bill from another state but said it was unchristian. He believes the only reason the state didn't want criminal jurisdiction was because it would cost too much money but civil jurisdiction was easier to do. He asked that the legislature give the Indians time to vote whether they want this civil jurisdiction but added they don't want it. Standing Rock is partly in North Dakota and partly in South Dakota so this would put only part of the reservation in civil jurisdiction which would create problems. Mr. Sonosky gave an example of Petitions filed in 7th district circuit court in South Dakota of Julia Hankins which was appealed. He stated that Standing Rock is eligible for a million and a half dollar housing project this year. But if they are under civil jurisdiction, they are not eligible.

\* \* \* \* \* \*

"Theodore Jamerson, past tribal chairman and a present employee on Standing Rock Reservation, introduced several men with him from the reservation. He took a definite stand against S.B. No. 30. He feels they have a good setup for their Indian people. We only hear about the bad ones and not the good ones. He stated that Standing Rock Indian reservation courts are far superior to County Courts and also the police department. They are interested in the textile plant at McLaughlin, South Dakota and the cheese plant at Selfridge. He went on to say that the reservation operates their program according to the individual's ability and not all on the same level. They are trying to raise eco-

nomic standards of living so they can get away from Welfare. He left several reports with the Committee.

\* \* \* \* \* \*

"Carl Whitman, tribal chairman, Ft. Totten reservation said the general feeling of the reservation is against civil jurisdiction and he is convinced our Indians aren't ready for civil jurisdiction. His Indians are still adjusting to displacing of their homes for the Garrison Dam. He feels state should wait until the Indian asks for civil jurisdiction." Minutes of the Senate State and Federal Government Committee Meeting, January 15, 1963.

8. "§ 2.) Acceptance of jurisdiction may be by either of the following methods:
    1. Upon petition of a majority of the enrolled residents of a reservation who are twenty-one years of age or older; or
    2. The affirmative vote of the majority of the enrolled residents voting who are twenty-one years of age or older, at an election called and supervised by the North Dakota Indian affairs commission upon petition of fifteen percent of those eligible to vote at such an election.

\* \* \* \* \* \*

"§ 5.) An individual Indian may accept state jurisdiction as to himself and his property by executing a statement consenting to and declaring himself and his property to be subject to state civil jurisdiction as herein provided. Such jurisdiction shall become effective on the date of execution of such statement. The statement accepting state jurisdiction shall be filed in the office of the county auditor of the county in which the person resides and when so filed shall be conclusive evidence of acceptance of state civil jurisdiction as provided herein." N.D.Sess. Laws, Ch. 242, §§ 2, 5 (1963).

erly bring their action in state court providing they comply with Section 27–19–05. This will subject the property of the Tribes, as distinguished from the property of the individual Indians, to levy and execution pursuant to judgment of the state court except as such property may be exempt therefrom by appropriate state or federal law.

Further, because of what the United States Supreme Court has taught us in this case, we conclude that our language in *Nelson v. Dubois*, 232 N.W.2d 54, 57 (N.D. 1975) was too broad, and, accordingly, we disavow the following language of that case:

"We now conclude that state jurisdiction over Indian country may be obtained only by state and tribal compliance with Public Law 90–284, §§ 402 and 406. An individual defendant is no more able to confer jurisdiction upon the state than is a tribal council or a State, acting unilaterally. Section 27–19–05, N.D.C.C., enacted pursuant to Public Law 83–280, § 7 (1953), 67 Stat. 588, must now yield to the new federal doctrine." 232 N.W.2d at 57.

■ As neither the act itself nor the legislative history provides for or recognizes any type of "residuary" state jurisdiction, we conclude that the act terminated any such jurisdiction if it did previously exist.

■ Having so construed Chapter 27–19, N.D.C.C., we must now consider whether or not, as so construed, it violates either the State or the United States Constitution. We are convinced that it does not.

Affiliated argued, prior to the construction which we have now given Chapter 27–19, that it violated Article I, Section 9, of our State Constitution which requires

that all courts be open to everyone; [9] Article I, Section 22, of our State Constitution which requires all laws of a general nature to have a uniform operation; [10] and Article IV, Section 103, which is now, after renumbering, Article VI, Section 8, which provides that the district court shall have original jurisdiction of all causes.[11]  In our view, none of these provisions are being violated.

As for Article I, Section 9, the courts are open to Affiliated providing it complies with Section 27–19–05.  True, Affiliated will become subject to the court upon compliance with that section, but no more so than the defendants Wold Engineering and Schmit, Smith and Rush.

As for Article I, Section 22, that all laws of a general nature shall have a uniform operation, we have difficulty seeing how that has application to this case.  This is apparently an equal protection argument which will be incidentally involved when we consider the application of the equal protection clause of the Fourteenth Amendment to the United States Constitution.

As for Article VI, Section 8, which provides that the district court shall have original jurisdiction of all causes except as otherwise provided by law, we conclude that the contention that it has been violated by Chapter 27–19 as now construed is without merit.  The district court will have original jurisdiction if Affiliated complies with Section 27–19–05.

■ The last issue that we must discuss is the issue of whether or not Chapter 27–19, as now construed by our Court, violates certain provisions of the United States Constitution.  Affiliated contends that Chapter 27–19 violates the due process clause and the equal protection clause of

---

**9.** "All courts shall be open, and every man for any injury done him in his lands, goods, person or reputation shall have remedy by due process of law, and right and justice administered without sale, denial or delay.  Suits may be brought against the state in such manner, in such courts, and in such cases, as the legislative assembly may, by law, direct." N.D. Const. art. I, § 9.

**10.** "All laws of a general nature shall have a uniform operation." N.D. Const. art. I, § 22.

**11.** "The district court shall have original jurisdiction of all causes, except as otherwise provided by law, and such appellate jurisdiction as may be provided by law or by rule of the supreme court.  The district court shall have authority to issue such writs as are necessary to the proper exercise of its jurisdiction." N.D. Const. art. VI, § 8.

the Fourteenth Amendment.[12] All of the cases cited to us are distinguishable on the facts and none of the cases cited come even close to being comparable.

Affiliated quotes the following language from *Brinkerhoff-Faris Trust & Savings Co. v. Hill,* 281 U.S. 673, 682, 50 S.Ct. 451, 74 L.Ed. 1107 (1930), for the proposition that the United States Supreme Court has declared that procedural due process is an important constitutional right that cannot be destroyed by state legislative enactment:

> "But, while it is for the state courts to determine the adjective as well as the substantive law of the State, they must, in so doing, accord the parties due process of law. Whether acting through its judiciary or through its legislature, a State may not deprive a person of all existing remedies for the enforcement of a right, which the State has no power to destroy, unless there is, or was, afforded to him some real opportunity to protect it."

In *Hill,* the plaintiff brought suit to enjoin the collection of property taxes, alleging that the assessment violated the equal protection clause of the Fourteenth Amendment. In previous cases, the Supreme Court of Missouri had ruled that no administrative remedy was available and that injunctive relief was appropriate for the determination of the validity of such a claim. The Missouri court overruled the earlier cases, and it denied relief because the plaintiff had failed to seek a newly found administrative remedy. The United States Supreme Court determined that the practical effect of the judgment of the Missouri court was to deprive the plaintiff of property without affording it at any time an opportunity to be heard in its defense. "[B]y denying to it [the plaintiff] the only remedy ever available for the enforcement of its right to prevent the seizure of its

property, the judgment deprives the plaintiff of its property." 281 U.S. at 679, 50 S.Ct. at 454. The Court reversed the judgment because it had denied the plaintiff due process of law.

Affiliated argues that Chapter 27–19 operates to deprive tribal Indians, not only of procedural due process, but of access to state courts entirely.

Affiliated cites *Lynch v. Household Finance Corp.,* 405 U.S. 538, 544, 92 S.Ct. 1113, 1118, 31 L.Ed.2d 424 (1972), for the proposition that tribal Indians' property rights, protected under the due process clause, are no more destructible than are their civil liberties, which include the right "to sue." In *Lynch,* the United States Supreme Court reversed the lower court's dismissal of the appellant's complaint which alleged that a Connecticut law authorizing summary pre-judicial garnishment was invalid under the equal protection and due process clauses of the Fourteenth Amendment, and which sought declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, and its jurisdictional counterpart, 28 U.S.C. § 1343(3). The lower court had dismissed the complaint, in part, on the ground that it lacked jurisdiction under § 1343(3), because that section applied only if "personal" rights, as opposed to "property" rights, were allegedly impaired. The Court rejected that distinction in concluding that §§ 1983 and 1343(3) provide a federal judicial forum for the redress of wrongful deprivations of *property* by persons acting under color of state law.

Affiliated argues, based upon the broad legal propositions it has gleaned from *Hill,* and *Lynch,* "that strict constitutional scrutiny of Chapter 27–19 is justified because it clearly burdens Indians' rights that are protected by the Fourteenth Amendment," citing *Logan v. Zimmerman,* 455 U.S. 422,

---

**12.** "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United

States, nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

428, 102 S.Ct. 1148, 1154, 71 L.Ed.2d 265 (1982). We assume that what Affiliated refers us to by its citation to *Logan,* is the two-part due process inquiry articulated therein: "[W]e must determine whether Logan was deprived of a protected interest, and, if so, what process was his due," *id.,* and the Court's reference in that case to the holding in *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), that a cause of action is a species of property protected by the due process clause.

In our view, Affiliated has not been *deprived* of a protected interest or denied access to state courts because of legislative or judicial action by the state, but rather, to the contrary, jurisdiction has been offered by the state over all civil causes of action which arise on an Indian reservation upon acceptance by Indian people as provided by law. The *Indian people* have deprived themselves of access to state courts because they have not accepted state jurisdiction in the manner provided for in Chapter 27–19, N.D.C.C. The *tribes* will deprive themselves of access to the state courts in the future if they do not avail themselves of the opportunity provided for acceptance of state jurisdiction through our construction of Section 27–19–05, N.D.C.C., today.

Affiliated also asserts that Chapter 27–19 represents constitutionally suspect class-based legislation that singles out a discrete, insular minority for disadvantaged legislative treatment.

The case most closely related to this case, referred to by Mr. Justice Rehnquist in his dissent in this case, *Washington v. Confederated Bands and Tribes,* 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979), authored by Mr. Justice Stewart, appears to hold to the contrary. In *Washington v. Confederated Bands and Tribes,* the Court rejected a similar challenge to a Washington statute, Ch. 36, 1963 Wash.Laws, which obligated the state to assume civil and criminal jurisdiction over Indians and Indian territory within the state, subject only to the condition that in all but eight subject-matter areas jurisdiction would not extend to Indians on trust or restricted lands without the request of the Indian tribe affected. In holding that this "checkerboard" pattern of jurisdiction applicable on the reservations of non-consenting tribes was not on its face invalid under the equal protection clause of the Fourteenth Amendment, the United States Supreme Court said:

"First, it [the Tribe] argues that the classifications implicit in Chapter 36 are racial classifications, 'suspect' under the test enunciated in *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 [(1964)], and that they cannot stand unless justified by a compelling state interest. Second, it argues that its interest in self-government is a fundamental right, and that Chapter 36—as a law abridging this right—is presumptively invalid. Finally, the Tribe argues that Chapter 36 is invalid even if reviewed under the more traditional equal protection criteria articulated in such cases as *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 [(1976)].

"We agree with the Court of Appeals to the extent that its opinion rejects the first two of these arguments and reflects a judgment that Chapter 36 must be sustained against an Equal Protection Clause attack if the classifications it employs 'rationally furthe[r] the purpose identified by the State.' *Massachusetts Bd. of Retirement v. Murgia, supra,* at 314, 96 S.Ct., at 2567. It is settled that 'the unique legal status of Indian tribes under federal law' permits the Federal Government to enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive. *Morton v. Mancari,* 417 U.S. 535, 551–552, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 [(1974)]. States do not enjoy this same unique relationship with Indians, but Chapter 36 is not simply another state law. It was enacted in response to a federal measure explicitly designed to readjust the allocation of jurisdiction over Indians. The jurisdiction permitted un-

der Chapter 36 is, as we have found, within the scope of the authorization of Pub.L. 280. And many of the classifications made. by Chapter 36 are also made by Pub.L. 280. Indeed, classifications based on tribal status and land tenure inhere in many of the decisions of this Court involving jurisdictional controversies between tribal Indians and the States, see, *e.g.,* *United States v. McBratney,* 104 U.S. 621, [14 Otto 621], 26 L.Ed. 869 [(1881)]. For these reasons, we find the argument that such classifications are 'suspect' an untenable one. The contention that Chapter 36 abridges a 'fundamental right' is also untenable. It is well established that Congress, in the exercise of its plenary power over Indian affairs, may restrict the retained sovereign powers of the Indian tribes. See, *e.g.,* *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 [(1978)]. In enacting Chapter 36, Washington was legislating under explicit authority granted by Congress in the exercise of that federal power." [Footnotes omitted.]

Chapter 27–19 does not constitute a restriction against Indian people or individual Indians accepting the jurisdiction of the state judicial system, rather it is a limitation of the state judicial system preventing it from imposing jurisdiction upon the Indian people or individual Indians against their will and without their consent. The statute does not treat them less than equal, it treats them more than equal. In light of the fact that they have demanded this unique treatment, they cannot reasonably complain of it, especially when they have within themselves the power to be free from this protective web if they so desire. Not only do they have the authority to accept jurisdiction, but they have the authority after acceptance to terminate it.[13] It would be difficult to contemplate a statute which was fair to all that could protect the Indian more and restrict the Indian less than Chapter 27–19.

Accordingly, we vacate the opinion initially rendered by our Court on July 1, 1982, substitute this opinion therefor, and remand this case to the district court with instructions to proceed consistent herewith.

In so holding, we suspect that neither side of this controversy will be completely satisfied. This causes us to assert that, aside from the very narrow issue of residuary jurisdiction involved in this case, the Indian people will not receive justice on a par with other citizens of this state until they realize that their rights are best preserved in the state courts and they *vote to accept* state jurisdiction in all civil cases; or until the Congress of the United States so realizes and as a consequence *requires* acceptance of state jurisdiction by the Indian tribes and the Indian people; or until the Congress of the United States *creates a federal court* with jurisdiction to decide civil cases arising within the exterior boundaries of Indian reservations. Indians are now full citizens of this state, they have the franchise and they could receive the fruits of justice in our state courts if they would but accept jurisdiction for all

**13.** "Civil jurisdiction as herein provided over an Indian reservation may be terminated by petition of three-fourths of the enrolled residents of a reservation who are eighteen years of age or older. Such petition shall be filed with the North Dakota Indian affairs commission." § 27–19–11, N.D.C.C.

"Upon the filing of a petition for withdrawal from the civil jurisdiction of the state, the executive director of the North Dakota Indian affairs commission after substantiating that the provisions of section 27–19–11 have been complied with shall certify such withdrawal to the governor. Upon such certification the governor shall, within ten days, issue a proclamation proclaiming that thirty days from the date of the issuance of such proclamation the civil jurisdiction of the state shall be terminated except as to those causes of action which arose prior to the effective date of such termination or to those contractual obligations which were incurred prior to the effective date of such termination of state civil jurisdiction." § 27–19–12, N.D.C.C.

"An individual who has accepted state civil jurisdiction under the provisions of section 27–19–05 may withdraw upon filing with the county auditor a statement declaring his withdrawal. Such withdrawal shall not affect causes of action which arose prior to such withdrawal or contractual obligations which were incurred prior to such withdrawal." § 27–19–13, N.D.C.C.

civil purposes, submit their problems to those courts, and have faith in the judicial system which all other citizens, irrespective of their ancestry, must and do rely upon.

In view of the realization that over 20 years have elapsed since the Legislature conducted its study into Indian problems, the unfulfilled great hope of the Legislature in the improvement of Indian and non-Indian relations which would result from the ultimate assumption by the state or acceptance by the Indian people of civil jurisdiction, and the existence of a multitude of problems arising from the lack of uniform jurisdiction, we believe it to be appropriate and timely for the Legislature to again create an interim Indian jurisdiction study committee, which would include representatives of the Indian people, which study hopefully might be conducted contemporaneously with a national study by Congress with the object of finding a solution to these complex and emotional problems. It is quite obvious that a court such as ours cannot resolve the problems in a piece-meal, case-by-case basis. Ultimately, most issues in this area are brought to this Court with very disappointing results because we are required to say in most cases that our state courts do not have jurisdiction to decide the issues that cry out for an answer.

Notwithstanding what we have just said in the two preceding paragraphs, we emphasize that we are relying in this case wholly on independent and adequate state grounds. Those grounds are that Chapter 27–19, N.D.C.C., requires and permits the disposition we have made in this case and that our disposition does not offend the state constitution.

GIERKE and VANDE WALLE, JJ., and PEDERSON, Surrogate Justice, concur.

Surrogate Justice PEDERSON participated in this case by assignment pursuant to § 27–17–03, N.D.C.C.

Justice PAUL M. SAND, who died on December 8, 1984, was a member of this Court at the time this case was submitted.