# THREE AFFILIATED TRIBES OF THE FORT BERTHOLD RESERVATION *v.* WOLD ENGINEERING, P. C., ET AL.

No. 84–1973.   Argued March 24, 1986—Decided June 16, 1986

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, BLACKMUN, and POWELL, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which BRENNAN and STEVENS, JJ., joined, *post*, p. 893.

*Raymond Cross* argued the cause for petitioner. With him on the brief were *John O. Holm* and *Christopher D. Quale.*

*Gary H. Lee* argued the cause and filed a brief for respondents.*

JUSTICE O'CONNOR delivered the opinion of the Court.

Petitioner, Three Affiliated Tribes of the Fort Berthold Reservation, sought to sue respondent, Wold Engineering, P. C. (hereafter respondent), in state court for negligence and breach of contract. The North Dakota Supreme Court held that Chapter 27–19 of the North Dakota Century Code (1974) disclaimed the unconditional state court civil jurisdiction North Dakota had previously extended to tribal Indians suing non-Indians in state court. It ruled that under Chapter 27–19, petitioner could not avail itself of state court jurisdiction unless it consented to waive its sovereign immunity and to have any civil disputes in state court to which it is a party adjudicated under state law. 364 N. W. 2d 98 (1985). The question presented is whether Chapter 27–19, as construed by the North Dakota Supreme Court, is repugnant to the Federal Constitution or is pre-empted by federal Indian law.

## I

This is the second time this Court has been called upon to address this jurisdictional controversy. See *Three Affiliated Tribes* v. *Wold Engineering*, 467 U. S. 138 (1984) *(Three Tribes I)*. Because the facts and procedural history of the litigation were set forth in some detail in *Three Tribes I*, our present recitation will be brief.

*Briefs of *amici curiae* urging reversal were filed for the Standing Rock Sioux Tribe et al. by *Reid Peyton Chambers, Donald J. Simon,* and *Kevin A. Griffin;* and for the Turtle Mountain Band of Chippewa Indians by *Kim Jerome Gottschalk.*

*Nicholas J. Spaeth,* Attorney General, and *Terry L. Adkins,* Assistant Attorney General, filed a brief for the State of North Dakota as *amicus curiae* urging affirmance.

Historically, Indian territories were generally deemed beyond the legislative and judicial jurisdiction of the state governments. See *id.*, at 142. This restriction was reflected in the federal statute which admitted North Dakota to the Union, Enabling Act of Feb. 22, 1889, § 4, cl. 2, 25 Stat. 677, and was embodied in the form of jurisdictional disclaimers in North Dakota's original Constitution. See N. D. Const., Art. XVI, § 203, cl. 2 (1889). The pre-existing federal restrictions on state jurisdiction over Indian country were largely eliminated, however, in 1953 with Congress' enactment of the Act of Aug. 15, 1953, 67 Stat. 588, as amended, 28 U. S. C. § 1360, which is commonly known as Pub. L. 280. Public Law 280 gave federal consent to the assumption of state civil and criminal jurisdiction over Indian country and provided the procedures by which such an assumption could be made. See *Three Tribes I, supra,* at 143. As originally enacted, Pub. L. 280 did not require the States to obtain the consent of affected Indian tribes before assuming jurisdiction over them, but Title IV of the Civil Rights Act of 1963 amended Pub. L. 280 to require that all subsequent assertions of jurisdiction be preceded by tribal consent. Pub. L. 90–284, §§ 401, 402, 406, 82 Stat. 78–80, codified at 25 U. S. C. §§ 1321, 1322, 1326.

As this Court explained in *Three Tribes I:*

> "Even before North Dakota moved to amend its Constitution and assume full jurisdiction under Pub. L. 280, the North Dakota Supreme Court had taken an *expansive* view of the scope of state-court jurisdiction over Indians in Indian country. In 1957, the court held [in *Vermillion* v. *Spotted Elk*, 85 N. W. 2d 432 (1957)] that the existing jurisdictional disclaimers in the Enabling Act and the State's Constitution foreclosed civil jurisdiction over Indian country only in cases involving interests in Indian lands themselves." 467 U. S., at 143–144.

Although *Vermillion* v. *Spotted Elk*, 85 N. W. 2d 432 (1957), was decided after the enactment of Pub. L. 280, the North

Dakota Supreme Court made clear that it was confirming pre-existing jurisdiction rather than establishing a previously unavailable jurisdictional category. *Id.*, at 435–436. See also *Three Tribes I, supra*, at 150, n. 9.

That part of *Vermillion* that recognized jurisdiction over non-Indians' claims against Indians impermissibly intruded on tribal self-government and thus could not be sustained. 467 U. S., at 148. See also *Fisher* v. *District Court*, 424 U. S. 382 (1976); *Williams* v. *Lee*, 358 U. S. 217 (1959). But, as this Court in *Three Tribes I* affirmed, North Dakota's recognition of jurisdiction over the claims of Indian plaintiffs against non-Indian defendants was lawful because such jurisdiction did not interfere with the right of tribal Indians to govern themselves and was not subject to Pub. L. 280's procedural requirements since the jurisdiction was lawfully assumed prior to that enactment. See 467 U. S., at 148–149, 151, n. 11.

In 1958, North Dakota amended its Constitution to authorize its legislature to provide by statute for the acceptance of jurisdiction over Indian country, see N. D. Const., Art. XIII, § 1, cl. 2, and in 1963, the North Dakota Legislature enacted Chapter 27–19. That Chapter provides, in pertinent part:

> "In accordance with the provisions of Public Law 280 . . . and [the amended] North Dakota constitution, jurisdiction of the state of North Dakota shall be extended over all civil claims for relief which arise on an Indian reservation upon acceptance by Indian citizens in a manner provided by this chapter. Upon acceptance the jurisdiction of the state is to the same extent that the state has jurisdiction over other civil claims for relief, and those civil laws of this state that are of general application to private property have the same force and effect within such Indian reservation or Indian country as they have elsewhere within this state." N. D. Cent. Code § 27–19–01 (Supp. 1985).

In subsequent cases, the North Dakota Supreme Court read this provision to "completely disclaim" the state jurisdiction recognized in *Vermillion* in cases in which the defendant was an Indian, absent tribal consent to jurisdiction as provided by statute. See, *e. g., In re Whiteshield*, 124 N. W. 2d 694 (1963). However, until the instant suit, the court never squarely held that Chapter 27–19 also disclaimed the jurisdiction *Vermillion* lawfully recognized over cases in which an Indian sued a non-Indian in state court for a claim arising in Indian country. See *Three Tribes I*, 467 U. S., at 144–145.

Petitioner filed the instant suit against respondent in state court for negligence and breach of contract in connection with respondent's construction of a water-supply system on petitioner's reservation. At the time the suit was filed, petitioner's tribal court did not have jurisdiction over such claims. After counterclaiming for petitioner's alleged failure to make payments on the system, respondent moved to dismiss petitioner's complaint, arguing that the state court had no jurisdiction because petitioner has never consented to state court jurisdiction over the Fort Berthold Reservation under Chapter 27–19. The trial court dismissed the suit for lack of jurisdiction, and the North Dakota Supreme Court affirmed the dismissal on appeal. 321 N. W. 2d 510 (1982).

In so doing, the North Dakota Supreme Court held that any residuary jurisdiction the North Dakota courts possessed under *Vermillion* over suits by an Indian against a non-Indian arising in Indian country was "totally disclaimed" when the North Dakota Legislature, "[u]nder the authority of Public Law 280," instituted the consent requirement of Chapter 27–19. 321 N. W. 2d, at 511–512. It concluded that "we have no jurisdiction over civil causes of action arising within the exterior boundaries of an Indian reservation, unless the Indian citizens of the reservation vote to accept jurisdiction." *Id.*, at 512. The court also rejected petitioner's federal and state constitutional challenges, relying in part on the argument that the discrimination against Indian litigants

embodied in Chapter 27–19 was authorized by Pub. L. 280 and was therefore insulated, under *Washington* v. *Yakima Indian Nation*, 439 U. S. 463 (1979), from heightened scrutiny. See 321 N. W. 2d, at 512–513.

This Court granted certiorari. 461 U. S. 904 (1983). We held that federal law did not preclude the state court from asserting jurisdiction over petitioner's claim. In particular, we ruled that Pub. L. 280 neither required nor authorized North Dakota to disclaim the jurisdiction it had lawfully exercised over the claims of Indian plaintiffs against non-Indian defendants prior to the enactment of Pub. L. 280. See *Three Tribes I*, 467 U. S., at 150. Because the North Dakota Supreme Court's interpretation of Chapter 27–19 and its accompanying constitutional analysis appeared to rest on a possible misunderstanding of Pub. L. 280, this Court vacated the judgment and remanded the case to allow the North Dakota court to reconsider the jurisdictional questions in light of the proper interpretation of the governing federal statute. *Id.*, at 141.

On remand, the North Dakota Supreme Court held that Chapter 27–19 terminated any residuary jurisdiction that may have existed over claims arising in Indian country brought by tribal Indians against non-Indians in state court. 364 N. W. 2d, at 104. It further held that state law barred petitioner from maintaining its suit in state court absent its waiver of its sovereign immunity in accordance with the statutory procedures. *Id.*, at 103–104. Finally, the court rejected petitioner's due process and equal protection challenges. It stated that petitioner had not been denied a due process right to access to the courts by action of the State, reasoning that it was the Indian people who had deprived themselves of access to state jurisdiction in declining to avail themselves of the State's jurisdictional offer by waiving their sovereign immunity. See *id.*, at 106. The North Dakota court then ruled that the jurisdictional disclaimer did not violate the Equal Protection Clause because, by virtue of the

consent provision, "[t]he statute does not treat [the Tribe] less than equal, it treats them more than equal." *Id.*, at 107.

We granted certiorari to examine petitioner's claims that Chapter 27–19 violates the Federal Constitution and is preempted by federal Indian law. Although respondent at no time objected to our consideration of the federal pre-emption issue, and in fact briefed it on the merits, our review of the proceedings below indicates that this question was not explicitly raised before, and was not decided by the North Dakota Supreme Court. We have recognized that in such circumstances there is a "weighty presumption against review." *Heath* v. *Alabama*, 474 U. S. 82, 87 (1985). See also *Illinois* v. *Gates*, 462 U. S. 213, 218–222 (1983). We believe, however, that this presumption has been overcome in this instance by a combination of circumstances.

First, respondent's failure to raise any challenge to our consideration of the pre-emption issue, cf. *Oklahoma City* v. *Tuttle*, 471 U. S. 808, 815–816 (1985), and its apparent willingness to have the question decided, argues for review. Second, this case has already been sent back to the North Dakota Supreme Court once, and we are reluctant to further burden that court by resolving less than all the federal questions addressed by the parties. Since we have twice had the benefit of the Supreme Court of North Dakota's reasoning on closely aligned issues, we do not believe that our consideration of the federal pre-emption issue is a disservice to that court or to the litigants, or impairs our informed decision of the issue.

Because we believe that the North Dakota law is preempted insofar as it is applied to disclaim pre-existing jurisdiction over suits by tribal plaintiffs against non-Indians for which there is no other forum, absent the Tribe's waiver of its sovereign immunity and consent to the application of state civil law in all cases to which it is a party, we reverse.

## II

Our cases reveal a "'trend . . . away from the idea of inherent Indian sovereignty as a[n independent] bar to state jurisdiction and toward reliance on federal pre-emption.'" *Rice* v. *Rehner*, 463 U. S. 713, 718 (1983) (quoting *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 172 (1973) (footnote omitted)). Yet considerations of tribal sovereignty, and the federal interests in promoting Indian self-governance and autonomy, if not of themselves sufficient to "pre-empt" state regulation, nevertheless form an important backdrop against which the applicable treaties and federal statutes must be read. See, *e. g.*, *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324, 334 (1983); *Rice* v. *Rehner*, *supra*, at 718–719. Accordingly, we have formulated a comprehensive pre-emption inquiry in the Indian law context which examines not only the congressional plan, but also "the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 145 (1980). In the instant case, this pre-emption inquiry yields the conclusion that the legislative plan embodied in Pub. L. 280 forecloses North Dakota from disclaiming jurisdiction over petitioner's suit, and further, that the state interest advanced by the North Dakota jurisdictional scheme in this context is overshadowed by longstanding federal and tribal interests.

## A

Public Law 280 represents the primary expression of federal policy governing the assumption by States of civil and criminal jurisdiction over the Indian Nations. The Act was the result of "comprehensive and detailed congressional scrutiny," *Kennerly* v. *District Court of Montana*, 400 U. S. 423, 424, n. 1, 427 (1971), and was intended to replace the ad hoc regulation of state jurisdiction over Indian country with general legislation, providing "for all affected States to come

within its terms." S. Rep. No. 699, 83d Cong., 1st Sess., 5 (1953). See also Goldberg, Public Law 280: The Limits of State Jurisdiction over Reservation Indians, 22 UCLA L. Rev. 535, 540–544 (1975). In examining the effect of comprehensive legislation governing Indian matters such as this, "our cases have rejected a narrow focus on congressional intent to pre-empt state law as the sole touchstone. They have also rejected the proposition that pre-emption requires 'an express congressional statement to that effect.'" *New Mexico* v. *Mescalero Apache Tribe, supra,* at 334 (quoting *White Mountain Apache Tribe* v. *Bracker, supra,* at 144) (footnote omitted). See also *Rice* v. *Rehner, supra,* at 719. Rather, we have found that where a detailed federal regulatory scheme exists and where its general thrust will be impaired by incompatible state action, that state action, without more, may be ruled pre-empted by federal law. See, *e. g.,* *Warren Trading Post Co.* v. *Arizona Tax Comm'n,* 380 U. S. 685 (1965).

Given the comprehensiveness of the federal regulation in this area of Indian law, our conclusion in *Three Tribes I* that Congress generally intended to authorize the assumption, not the disclaimer, of state jurisdiction over Indian country is persuasive evidence that the instant disclaimer conflicts with the federal scheme. See 467 U. S., at 150. But we need not rest upon this conclusion alone, for Congress' specific treatment of the retrocession of previously assumed jurisdiction permits no doubt that North Dakota's disclaimer is inconsistent with the requirements of Pub. L. 280.

As originally enacted, Pub. L. 280 plainly contemplated that, if States chose to extend state court jurisdiction over causes of action arising in Indian country, they would be required to honor that commitment, for the Act made no provision for States to return any jurisdiction to the United States. See F. Cohen, Handbook of Federal Indian Law 370 (1982) (hereinafter Cohen). Congress' failure to provide for the retrocession of jurisdiction assumed by the States is fully

consistent with the purposes underlying Pub. L. 280: promoting the gradual assimilation of Indians into the dominant American culture and easing the fiscal and administrative burden borne by the Federal Government by virtue of its control over Indian affairs. See Goldberg, *supra*, at 542–544. See also H. R. Rep. No. 848, 83d Cong., 1st Sess., 3, 6 (1953). Were States permitted, at their option and at any time, to retrocede all or part of the jurisdiction they had assumed and to leave Indians with no recourse for civil wrongs, the congressional plan of gradual but steady assimilation could be disrupted and the divestment of federal dominance nullified.

When Congress subsequently revisited the question of retrocession in the 1968 amendments, it provided that "[t]he United States is authorized to accept a retrocession by any State," 25 U. S. C. § 1323(a), but it specifically limited this authorization to the retrocession of jurisdiction assumed under Pub. L. 280 pursuant to the original 1953 version of the statute. See *ibid.* (permitting retrocession of jurisdiction "acquired by [the] State pursuant to the provisions of section 1162 of title 18, of the United States Code, section 1360 of title 28, of the United States Code, or section 7 of the Act of August 15, 1953 (67 Stat. 588), as it was in effect prior to its repeal by subsection (b) of this section"). See also Exec. Order No. 11435, 3 CFR 754 (1966–1970 Comp.) (giving Secretary of the Interior discretionary authority to accept retrocession of jurisdiction by a State); Goldberg, *supra*, at 558–559. This retrocession provision apparently was added in response to Indian dissatisfaction with Pub. L. 280. See Cohen 370. In light of this congressional purpose, the fact that Congress did not provide for retrocession of jurisdiction lawfully assumed prior to the enactment of Pub. L. 280 or of jurisdiction assumed after 1968 cannot be attributed to mere oversight or inadvertence. Since Congress was motivated by a desire to shield the Indians from unwanted extensions of jurisdiction over them, there was no need to provide for

retrocession in those circumstances because the previously assumed jurisdiction over Indian country was only lawful to the extent that it was consistent with Indian tribal sovereignty and self-government, see, *e. g., Williams* v. *Lee,* 358 U. S. 217 (1959), and the jurisdiction assumed after 1968 could be secured only upon the receipt of tribal consent. See 25 U. S. C. § 1321.

North Dakota may not, and indeed has not attempted to, rely on § 1323(a) as authority for its disclaimer of jurisdiction over claims such as petitioner's because it did not assume such jurisdiction under any of the provisions specified in § 1323(a), nor has the United States accepted the retrocession. We have previously enforced the procedural requirements and the jurisdictional provisions of Pub. L. 280 quite stringently, consistent with our understanding that the jurisdictional scheme embodied in that Act was the product of a wide-ranging and detailed congressional study. See, *e. g., Kennerly* v. *District Court of Montana,* 400 U. S., at 427. See also *Washington* v. *Yakima Indian Nation,* 439 U. S., at 484 ("the procedural requirements of Pub. L. 280 must be strictly followed"); *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S., at 180. Accordingly, we conclude that since North Dakota's disclaimer is not authorized by § 1323(a), it is barred by that section.

In sum, because Pub. L. 280 was designed to extend the jurisdiction of the States over Indian country and to encourage state assumption of such jurisdiction, and because Congress specifically considered the issue of retrocession but did not provide for disclaimers of jurisdiction lawfully acquired other than under Pub. L. 280 prior to 1968, we must conclude that such disclaimers cannot be reconciled with the congressional plan embodied in Pub. L. 280 and thus are pre-empted by it.

## B

Our consideration of the State's interest in disclaiming the pre-existing, unconditional jurisdiction extended to tribal

Indians suing non-Indian defendants, and in replacing it with an extension of jurisdiction conditioned on the Tribe's waiver of its sovereign immunity and its agreement to the application of state law in all suits to which it is a party, reinforces our conclusion that Chapter 27–19 is inconsistent with federal law. Simply put, the state interest, as presently implemented, is unduly burdensome on the federal and tribal interests.

As the North Dakota Supreme Court explained, Chapter 27–19 was originally designed as a unilateral assumption of jurisdiction over Indian country, which was intended to provide a means of enforcing contracts between Indians and non-Indians and a tribunal for trying tort actions, family law matters, and "many [other] types of actions too numerous to mention." 364 N. W. 2d, at 102, and n. 5. The North Dakota Legislature added the consent provision to Chapter 27–19 as a compromise to "accommodate the will of the Indian people." *Id.*, at 103. Those Indians who opposed the assertion of state jurisdiction against them would not be subjected to it absent consent, but neither would they be permitted to enjoy state jurisdiction as plaintiffs absent consent to suit as defendants. See *id.*, at 107. Certainly, the State's interest in requiring that all its citizens bear equally the burdens and the benefits of access to the courts is readily understandable. But here, federal interests exist which override this state interest.

The federal interest in ensuring that all citizens have access to the courts is obviously a weighty one. See, *e. g., California Motor Transport Co.* v. *Trucking Unlimited,* 404 U. S. 508, 510, 513–514 (1972); *Bill Johnson's Restaurants, Inc.* v. *NLRB,* 461 U. S. 731, 741, 742–744 (1983). This Court and many state courts have long recognized that Indians share this interest in access to the courts, and that tribal autonomy and self-government are not impeded when a State allows an Indian to enter its court to seek relief against a non-Indian concerning a claim arising in Indian country. See,

*e. g.,* *Three Tribes I,* 467 U. S., at 148, and n. 7 (citing authority). North Dakota conditions the Tribe's access to the courts on its waiver of its tribal sovereign immunity and agreement to the application of state civil law in all state court civil actions to which it is or may be a party. These conditions apply regardless of whether, as here, the Tribe has no other effective means of securing relief for civil wrongs. As the State concedes, even if the Tribe were to have access to tribal court to resolve civil controversies with non-Indians, it would be unable to enforce those judgments in state court; thus, the Tribe cannot be said to have a meaningful alternative to state adjudication by way of access to other tribunals in such cases. See Tr. of Oral Arg. 26, 27. Cf. *Lohnes* v. *Cloud,* 254 N. W. 2d 430 (N. D. 1977). Respondent argues that the Tribe is not truly deprived of access to the courts by the North Dakota jurisdictional scheme because the Tribe could have unrestricted access to the State's courts by "merely" consenting to the statutory conditions. We conclude, however, that those statutory conditions may be met only at an unacceptably high price to tribal sovereignty and thus operate to effectively bar the Tribe from the courts.

The North Dakota jurisdictional scheme requires the Tribe to accept a potentially severe intrusion on the Indians' ability to govern themselves according to their own laws in order to regain their access to the state courts. The statute provides that "[t]he civil jurisdiction herein accepted and assumed [upon Indian consent] shall include but shall not be limited to the determination of parentage of children, termination of parental rights, commitments by county courts, guardianship, marriage contracts, and obligations for the support of spouse, children, or other dependents." N. D. Cent. Code § 27–19–08 (Supp. 1985). Although these subjects clearly encompass areas of traditional tribal control, see *Fisher* v. *District Court,* 424 U. S., at 388–389; *United States* v. *Quiver,* 241 U. S. 602 (1916), the North Dakota statute contemplates that state civil law will control in these areas. See

§ 27–19–01. Respondent argues that Chapter 27–19 safeguards tribal self-government by also providing that any tribal ordinance or custom "shall, if not inconsistent with the applicable civil law of this state, be given full force and effect in the determination of civil claims for relief pursuant to this section." § 27–19–09. This provision plainly provides that state law will generally control, however, and will merely be supplemented by nonconflicting Indian ordinances or customs, even in cases that arise on the reservation, that involve only Indians, and that concern subjects which are within the jurisdiction of the tribal court.

This result simply cannot be reconciled with Congress' jealous regard for Indian self-governance. See, *e. g.*, *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S., at 334–335, and n. 17 ("[B]oth the tribes and the Federal Government are firmly committed to the goal of promoting tribal self-government, a goal embodied in numerous federal statutes"). See also *Fisher* v. *District Court, supra*, at 388–389. "A tribe's power to prescribe the conduct of tribal members has never been doubted, and our cases establish that 'absent governing Acts of Congress,' a State may not act in a manner that 'infringe[s] on the right of reservation Indians to make their own laws and be ruled by them.'" *New Mexico* v. *Mescalero Apache Tribe, supra*, at 332 (quoting *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S., at 171–172).

Chapter 27–19's requirement that the Tribe consent to suit in *all* civil causes of action before it may again gain access to state court as a plaintiff also serves to defeat the Tribe's federally conferred immunity from suit. The common law sovereign immunity possessed by the Tribe is a necessary corollary to Indian sovereignty and self-governance. See, *e. g.*, *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49 (1978). Of course, because of the peculiar "quasi-sovereign" status of the Indian tribes, the Tribe's immunity is not congruent with that which the Federal Government, or the States, enjoy. *United States* v. *United States Fidelity & Guaranty Co.*, 309

U. S. 506, 513 (1940).   Cf. also *McClanahan* v. *Arizona State Tax Comm'n, supra,* at 173.   And this aspect of tribal sovereignty, like all others, is subject to plenary federal control and definition.   See *Santa Clara Pueblo* v. *Martinez, supra,* at 58.   Nonetheless, in the absence of federal authorization, tribal immunity, like all aspects of tribal sovereignty, is privileged from diminution by the States.

To be sure, not all conditions imposed on access to state courts which potentially affect tribal immunity, and thus tribal self-government, are objectionable.   For instance, even petitioner concedes that its tribal immunity does not extend to protection from the normal processes of the state court in which it has filed suit.   See Tr. of Oral Arg. 7, 10–11 ("The Three Affiliated Tribes believe it would be proper in the interest of justice that they would be subject to discovery proceedings and to proceedings that would insure a fair trial to the non-Indian defendants").   Petitioner also concedes that a non-Indian defendant may assert a counterclaim arising out of the same transaction or occurrence that is the subject of the principal suit as a setoff or recoupment.   See *id.,* at 6–7, 9.   It is clear, however, that the extent of the waiver presently required by Chapter 27–19 is unduly intrusive on the Tribe's common law sovereign immunity, and thus on its ability to govern itself according to its own laws.   By requiring that the Tribe open itself up to the coercive jurisdiction of state courts for *all* matters occurring on the reservation, the statute invites a potentially severe impairment of the authority of the tribal government, its courts, and its laws.   See, *e. g., Fisher* v. *District Court, supra,* at 387–388.*

---

*The extent to which respondent's counterclaim may be used not only to defeat or reduce petitioner's recovery, but also to fix the Tribe's affirmative liability has been the subject of some discussion in this case.   See, *e. g.,* Tr. of Oral Arg. 6–11.   We have no occasion to resolve this issue because the case comes to us before trial and we do not know the extent of the counterclaim asserted by respondent.

Public Law 280 certainly does not constitute a "governing Act of Congress" which validates this type of interference with tribal immunity and self-government. We have never read Pub. L. 280 to constitute a waiver of tribal sovereign immunity, nor found Pub. L. 280 to represent an abandonment of the federal interest in guarding Indian self-governance. As we explained in *Bryan* v. *Itasca County*, 426 U. S. 373, 387–388 (1976):

> "Today's congressional policy toward reservation Indians may less clearly than in 1953 favor their assimilation, but Pub. L. 280 was plainly not meant to effect total assimilation . . . . [N]othing in its legislative history remotely suggests that Congress meant the Act's extension of civil jurisdiction to the States should result in the undermining or destruction of such tribal governments as did exist and a conversion of the affected tribes into little more than 'private, voluntary organizations,' *United States* v. *Mazurie*, 419 U. S. 544, 557 (1975) . . . . The Act itself refutes such an inference: there is notably absent any conferral of state jurisdiction over the tribes themselves, and § 4(c), 28 U. S. C. § 1360(c), providing for the 'full force and effect' of any tribal ordinances or customs 'heretofore or hereafter adopted by an Indian tribe . . . if not inconsistent with any applicable civil law of the State,' contemplates the continuing vitality of tribal government." (Footnote omitted.)

Certainly, the 1968 amendments to Pub. L. 280 pointedly illustrate the continuing congressional concern over tribal sovereignty. The impetus for the addition of a consent requirement in the 1968 amendments was congressional dissatisfaction with the involuntary extension of state jurisdiction over Indians who did not feel they were ready to accept such jurisdiction, or who felt threatened by it. See, *e. g.,* S. Rep. No. 721, 90th Cong., 1st Sess., 32 (1967) (views of Sen. Ervin) ("Tribes have been critical of Public Law 280 because it authorizes the unilateral application of State law to

all tribes without their consent and regardless of their needs or special circumstances. Moreover, it appears that tribal laws were unnecessarily preempted . . ."); Rights of Members of Indian Tribes: Hearing on H. R. 15419 and Related Bills before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs, 90th Cong., 2d Sess., 25 (1968) (referring to tribal consent requirement as a way to ensure that Indians are not "subjected" to state courts' jurisdiction before they are ready).

In sum, the State's interest is overly broad and overly intrusive when examined against the backdrop of the federal and tribal interests implicated in this case. See *Rice* v. *Rehner*, 463 U. S., at 719. The perceived inequity of permitting the Tribe to recover from a non-Indian for civil wrongs in instances where a non-Indian allegedly may not recover against the Tribe simply must be accepted in view of the overriding federal and tribal interests in these circumstances, much in the same way that the perceived inequity of permitting the United States or North Dakota to sue in cases where they could not be sued as defendants because of their sovereign immunity also must be accepted. Our examination of the state, tribal, and federal interests implicated in this case, then, reinforces our conclusion that North Dakota's disclaimer of jurisdiction over suits such as this cannot be reconciled with the congressional plan embodied in Pub. L. 280.

The judgment of the North Dakota Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE REHNQUIST, with whom JUSTICE BRENNAN and JUSTICE STEVENS join, dissenting.

North Dakota law provides that in order for an Indian tribe such as petitioner to avail itself of the jurisdiction of North Dakota courts as a plaintiff, it must also accept the jurisdiction of those courts when it is properly named as a defendant

in them. This Court holds that such a rule—which would commend itself to most people as eminently fair—is pre-empted by federal law. To support this conclusion the Court advances two arguments: first, pre-emption by Pub. L. 280, and, second, the "overshadowing" of the state interest by "longstanding federal and tribal interests." *Ante,* at 884. Neither by themselves nor in the rather awkward juxtaposition in which the Court places them are these arguments persuasive.

The Court's argument based on Pub. L. 280 consists of two assertions: (1) Pub. L. 280 pre-empts Chapter 27–19's disclaimer of pre-existing jurisdiction because the federal statute establishes a "comprehensive" legislative plan to govern Indian matters, and Chapter 27–19's disclaimer is incompatible with the plan's general purpose to authorize the assumption of state jurisdiction over Indian country, *ante,* at 884–885; and (2) the initial failure of Pub. L. 280 to authorize a disclaimer of jurisdiction, combined with the subsequent authorization of such disclaimer in the 1968 amendments with respect to jurisdiction assumed pursuant to Pub. L. 280, evidence a congressional intent to forbid the disclaimer of jurisdiction assumed prior to the passage of Pub. L. 280. *Ante,* at 885–887.

The Court provides no support for its assertion that Pub. L. 280 establishes a "comprehensive" federal scheme that pre-empts any state law that may inhibit the accomplishment of its general purpose. The Court's citation to *Kennerly* v. *District Court of Montana,* 400 U. S. 423, 427 (1971) *(per curiam),* is unhelpful; the Court there was describing the "comprehensive and detailed" scrutiny that Congress appeared to give in deciding whether or not to eliminate federal barriers to state jurisdiction over Indian matters, and not the nature of Pub. L. 280. In addition, the brevity of Pub. L. 280, its 1968 amendments, and the relevant legislative history belie the Court's assertion that these statutes establish a "comprehensive" plan like statutes that occupy a given field

of regulation.   Cf. *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 248 (1984).   Public Law 280 does little more than make a general pronouncement that certain federal barriers to state jurisdiction have been eliminated.   See Act of Aug. 15, 1953, ch. 505, § 7, 67 Stat. 590.   Nor does the legislative history, the 1968 amendments, or their legislative history provide any additions that transform the general pronouncement into a "comprehensive" plan.   See S. Rep. No. 699, 83d Cong., 1st Sess. (1953); Pub. L. 90–284, Title IV, §§ 402, 403, 82 Stat. 79; S. Rep. No. 721, 90th Cong., 1st Sess. (1967).

There is also nothing inconsistent between the State's disclaimer of pre-existing jurisdiction and the purpose of Pub. L. 280.   Congress stated that Pub. L. 280 was designed to accomplish two general purposes:

> "First, withdrawal of Federal responsibility for Indian affairs wherever practicable; and second, termination of the subjection of Indians to Federal laws applicable to Indians as such."   S. Rep. No. 699, *supra*, at 3.

The statute's elimination of certain federal barriers to the assertion of state jurisdiction over Indian country was an important means of furthering these goals.   But the statute's complete silence on the disclaimer of state jurisdiction cannot reasonably be taken to imply an intent to forbid such disclaimer.   This is especially true with respect to jurisdiction lawfully assumed before the passage of Pub. L. 280, since disclaimer of such jurisdiction would certainly have been entirely proper before passage of the Act.

Nor can any congressional intent to forbid the disclaimer of jurisdiction asserted prior to the passage of Pub. L. 280 be reasonably inferred from the subsequent authorization of such disclaimer with respect to jurisdiction asserted pursuant to Pub. L. 280.   This Court has long recognized that federal law has a "generally interstitial character," *Richards* v. *United States*, 369 U. S. 1, 7 (1962), in the sense that Congress generally enacts legislation against the background of existing state law.   See, *e. g.*, *Burks* v. *Lasker*, 441 U. S.

471, 478 (1979), citing P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 470–471 (2d ed. 1973). An appreciation for this traditional understanding of the nature of state power does not render superfluous the congressional authorization of disclaimer in the 1968 amendments to Pub. L. 280. See Pub. L. 90–284, Title IV, §§ 402, 403, 82 Stat. 79. Since the 1968 amendments were generally designed to impose a limitation on the ability of state legislatures to assert jurisdiction over Indian country, Congress could reasonably have intended the provision authorizing the disclaimer of previously asserted jurisdiction to encourage such disclaimer with a concomitant retention of a more limited form of jurisdiction. That the disclaimer provision referred only to jurisdiction asserted pursuant to Pub. L. 280 says nothing about congressional intent as to jurisdiction lawfully asserted in some other way. Given the traditional powers of state government, it is unreasonable to interpret such silence as evidence of an intent to forbid the States to disclaim jurisdiction asserted in another way. I find the Court's pre-emption analysis to be quite unconvincing.

I think the Court's reasoning supporting its conclusion that federal and tribal interests "overshadow" the State's interest in fair play for litigants fares no better than its reasoning about Pub. L. 280. The requirement that a tribe consent to the general civil jurisdiction of state courts as a *quid pro quo* for access to those courts as a plaintiff seems entirely fair and evenhanded to me. Nothing in Pub. L. 280 or any other federal statute requires a State to accept jurisdiction over Indian country in the first place. Nor has such an obligation been created as a matter of federal case law dealing with the Indians. To the contrary, all the cases and statutes with which I am familiar speak only to the limitations on the *assertion* of jurisdiction over these matters. Thus, because Congress and this Court have left the States free to bar access entirely by simply not asserting jurisdiction over Indian

country at all, I do not see how any "federal interest" precludes them from establishing conditions on the assertion of jurisdiction, and thereby on access to state courts, as North Dakota has done here: the employment of the North Dakota courts in matters in which the tribe has an interest shall not be solely at the option of the tribe.

I think there is nothing in Pub. L. 280 nor in federal Indian policy that prohibits North Dakota from applying its statute in the manner in which it did in this case, and I therefore dissent from the Court's contrary conclusion.