LIPEZ, Circuit Judge
(with whom TOR RUE L LA, Circuit Judge, joins), dissenting.
In an apparent attempt to limit the scope of its holding, the majority claims to rest its decision “squarely on [the] idiosyncratic features” of the Narragansett Tribe’s relationship with the State of Rhode Island. Then, in an effort that belies this narrow approach, the majority engages in a lengthy analysis of “the general body of Indian law” to support its idiosyncratic holding. Along the way, it repudiates two of our precedents to varying degrees. Respectfully, neither the majority’s characterization of this case as idiosyncratic nor its analysis of the general body of Indian law can withstand scrutiny. The Narragansett Tribe’s relationship with the State of Rhode Island reflects a familiar history. The majority’s application of tribal sovereign immunity in this case is incompatible with Supreme Court precedents. For these reasons, I join Judge Torruella in dissenting. I write separately to elaborate on my disagreement with the majority’s analysis.
A. A Common Fact Pattern
This is not an “idiosyncratic” case based on a “unique relationship.” The history of litigation and legislation outlined in the majority opinion is prototypical of that involving several tribes, especially in the East but also in parts of the West. The Narragansetts, like many of these tribes, brought suit in the 1970s to contend that their ancestral lands had been alienated in violation of the Indian Non-Intercourse Act. 1 Stat .137 (1790) (codified as amended at 25 U.S.C. § 177 (2000)). See, e.g., Oneida County v. Oneida Indian Nation of New York, 470 U.S. 220, 229-30, 105 S.Ct. 1245, 84 L.Ed.2d 109 (1985) (recounting litigation in New York); Miccosukee Tribe Of Indians of Florida v. Florida, No. 79- *32 253-CIV-JWK (S.D.Fla.) (1979); Mohegan Tribe of Indians v. Connecticut, C.A. No. H-77-434 (D.Conn.) (1977). Rhode Island, like several other states, decided to agree to certain of the Tribe’s demands, rather than to tolerate the depressed property values that had resulted from the Indians’ claims. See, e.g., 25 U.S.C. § 1772 (detailing “agreement” between Florida and Seminole Tribe, intended to resolve clouded land titles); 25 U.S.C. § 1771 (same re: Massachusetts and Wampanoag Tribe); 25 U.S.C. § 1774 (same re: New York and Seneca Nation). And, as it did in resolving other disputes between states and tribes, Congress enacted legislation to seal the deal. See generally 25 U.S.C. §§ 1701, 1721, 1741, 1751, 1771, 1772, 1773, 1774, 1775 (discussing Congressional role in resolving disputes in Rhode Island, Maine, Florida, Connecticut, Massachusetts, Washington State, and New York). What the majority says about sovereign immunity in this case has implications for the application of sovereign immunity in these similar contexts. The majority’s treatment of tribal sovereign immunity will not be limited to the facts of this ease.
B. Sovereignty and Sovereign Immunity
The concept of tribal sovereign immunity derives, of course, from the more general concept of tribal sovereignty. See Blatchford v. Native Village of Noatak, 501 C.S. 775, 782, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991) (explaining that Indian tribes are sovereign entities, subject to the control of the federal government but not the states); United States v. James, 980 F.2d 1314, 1319 (9th Cir.1992) (“Tribal immunity is just that: sovereign immunity that attaches to a tribe because of its status as a dependant domestic nation.”). But the two doctrines are not interchangeable. In a recent decision, we described the distinction between sovereignty and sovereign immunity as “subtle but important.” Aroostook Band of Micmacs v. Ryan, 404 F.3d 48, 68 (1st Cir.2005). We noted that when a tribe asserts its sovereignty, it is claiming, “in essence, that it is not subject to state laws ... at all.” Id. On the other hand, we said, “tribal sovereign immunity means that [a tribe] is not amenable to state judicial or quasi-judicial proceedings to enforce those laws,” even if the tribe is bound to observe them. Id.
The majority now overrules Aroostook “with respect to the distinction in question.” However, there are several Supreme Court cases in which a tribe has been held immune from suit even though it was subject to state law. Indeed, the case the majority cites for its rejection of the distinction in Aroostook, Oklahoma. Tax Comm’n v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 512-13, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), distinguished between tribal sovereignty and tribal sovereign immunity exactly as the panel did in Aroostook. In Oklahoma. Tax. Com/m’n, the Supreme Court concluded that an Indian tribe in Oklahoma lacked any sovereign authority to sell tax-free cigarettes on its lands. Even so, the Court reasoned, the tribe’s sovereign immunity remained intact, and Oklahoma could not sue the tribe to collect wrongfully withheld taxes. More recently, in Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc., 523 U.S. 751, 754-55, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998), the Court emphasized the same distinction. That case also involved a situation in which an Indian tribe had flouted state contract law but could not be sued in state court for a remedy. “There is a difference,” the Court observed in Kiowa Tribe, “between the right to demand compliance with state laws and the means available to enforce them.” Id. at 755, 118 *33 S.Ct. 1700. This “difference” is the precise distinction noted by the panel in Aroostook, and it is exactly the difficulty that the majority overlooks in this case. The State’s actions here cannot be approved solely by virtue of the State’s substantive authority to demand , the Tribe’s compliance with the cigarette tax laws. Oklahoma Tax Commit could not have been clearer on that point.
I accept that the Tribe never had any authority to “market an exemption from state taxation to persons who would normally do their business elsewhere,” and so was bound to assist the State in its collection of cigarette taxes. Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 155, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980). I acknowledge, as I explain below, that in agreeing to the language later embodied in section 1708(a), the Tribe could no longer shield its own members from state prosecution for offenses committed on tribal lands. I will even assume, without deciding, that the majority is correct that the Tribe’s sovereign autonomy is now limited largely to “matters of local governance.” Maj. Op. at 26 (quoting Rhode Island v. Narragansett Indian Tribe 19 F.3d at 701). None of this changes the fact that the Tribe’s sovereign immunity still extends, unless specifically limited, to “governmental or commercial activities ... on or off a reservation.” Kiowa, Tribe, 523 U.S. at 760, 118 S.Ct. 1700. A tribe’s sovereign authority and its sovereign immunity simply are not coterminous.
The majority also questions whether tribal sovereign immunity serves as a defense to the execution of a search warrant. At its core, tribal sovereign immunity protects a tribe from a lawsuit. See Kiowa, Tribe of Oklahoma, 523 U.S. at 754, 118 S.Ct. 1700 (holding that tribe’s sovereign immunity prevented lawsuit to collect on promissory note). But sovereign immunity also provides a defense to the efforts of states to enforce them criminal law against tribes. See Puyallup Tribe v. Department of Game, 433 U.S. 165, 171, 172-73, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) (allowing enforcement “analogous” to criminal prosecution against individual tribal members, but barring the state from using the same measures against a tribe itself); see also James, 980 F.2d at 1319-20 (recognizing that tribal sovereign immunity required quashing a criminal subpoena directed to Indian tribe). Since a tribe’s sovereign immunity protects it from a state’s civil suit to recover cigarette taxes, see Oklahoma Tax Comm’n, 498 U.S. at 513, 111 S.Ct. 905, and also provides protection in situations “analogous” to criminal prosecutions, tribal sovereign immunity is implicated when a state uses its criminal process to seize, from the Tribe itself, cigarettes that do not have tax stamps.
C. Waiver and Abrogation of Tribal Sovereign Immunity
1. “Force and Effect”
In addressing whether the Tribe’s sovereign immunity is intact, which it does despite disavowing the importance of the question, the majority focuses on language in the JMOU stating that the laws of Rhode Island would apply in “full force and effect,” and a similar statement in the Settlement Act providing that “the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island.” There is no other provision about jurisdiction in either document, I find the majority’s analysis of this language unconvincing. Congress has used this language for half a century to confer state jurisdiction over individual Indians on tribal lands. Both before and since the JMOU and Settlement Act, the Supreme *34 Court consistently has held that such language—however categorically stated— does not waive or abrogate tribal sovereign immunity.
As best as I can tell, the language of the JMOU and Settlement Act originated in 1953’s Public Law 280, where Congress provided for state “jurisdiction” to exist “to the same extent” and for the state laws to have “the same force and effect” on affected Indian lands as on non-Indian lands.[10] Two years before Congress adopted the Settlement Act, the Supreme Court expressly rejected the contention that this conferral of “jurisdiction” by the “force and effect” provision had abrogated or waived tribal sovereign immunity. In Bryan v. Itasca County, 426 U.S. 373, 389, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), the Court stated in plain language that “there is notably absent [in Public Law 280] any conferral of state jurisdiction over the tribes themselves.” The next year, the Supreme Court reiterated that the categorical grant of jurisdiction in Public Law 280 did not contain any abrogation of tribal sovereign immunity. See, Puyallup Tribe, 433 U.S. at 172-73, 97 S.Ct. 2616. Nine years later, in Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, 476 U.S. 877, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986), the Court repeated the conclusion in Itasca County and rejected a suggestion that Public Law 280 could provide an escape from tribal sovereign immunity. “We have never read Pub.L. 280,” the Court said, “to constitute a waiver of tribal sovereign immunity.” Id. at 892, 106 S.Ct. 2305. See also California ex rel California Dep’t of Fish and Game v. Quechan Tribe of Indians, 595 F.2d 1153, 1156 (9th Cir.1979) (explaining why Pub.L. 280⅛ extension of state jurisdiction over tribal lands did not subject the tribe to suit by the state to enforce state criminal laws).
As the majority says, “we must presume that Congress acts with knowledge of relevant Supreme Court precedent.” If we are to apply this maxim to an interpretation of section 1708(a), the most relevant precedents are Itasca County, which was decided just two years before Congress adopted § 1708(a), and Puyallup Tribe, enacted just one year before. If Congress had wanted to abrogate the Tribe’s sovereign immunity in 1978, it would not have done so by repeating language that the Supreme Court had held in each of the previous two years did not result in “any conferral of state jurisdiction over the tribes themselves.” Itasca County, 426 U.S. at 389, 96 S.Ct. 2102. This is especially so because, when it acted, Congress knew very well that the statute it produced would be “liberally construed, doubtful expressions being resolved in favor of the Indians.” Id. at 392, 96 S.Ct. 2102 (internal quotation marks omitted).
Nor do I understand how the “force and effect” language constituted a waiver of the Tribe’s sovereign immunity when it appeared in the Tribe’s JMOU with the State. The Tribe could not have understood that it was waiving its sovereign immunity to suit by the State by agreeing *35 that its lands—like the lands of so many other tribes—would be under the criminal authority of the State. Instead, the Tribe bargained for a relationship with State law enforcement that would mirror the relationship in dozens of places around the country, where the “force and effect” of a state’s criminal jurisdiction did not impair tribal sovereign immunity. In short, in preparing the JMOU and the Settlement Act, Congress, the State, and the Tribe all understood that the language they had chosen could not abrogate a tribe’s sovereign immunity.[11] Surely, if a waiver of tribal sovereign immunity really was “the State’s most important quid pro quo”—as the majority insists, without citation to any historical document—the State would have demanded different language.[12]
Accepting the majority’s contention that the Settlement Act contains a broader conferral of substantive jurisdiction than Public Law 280 does not change anything. I do not suggest that the Settlement Act and Public Law 280 serve identical purposes. I aver only that the parties to the JMOU and Settlement Act borrowed language from Public Law 280 at a time, and in a manner, that does not evince any intent to subject the Tribe itself to the criminal processes of the State. No matter how broadly the majority construes section 1708(a)’s jurisdictional language, the majority cannot point to anything in that section, in the broader Act, in the JMOU, or in the history underlying those documents, that even suggests any agreement that the Tribe itself could be made a party to state court process involuntarily.[13]
There is another reason to doubt the majority’s reading of the Settlement Act and JMOU, and another reason we can be sure that this is not an “idiosyncratic case.” The phrases that the majority uses to find an abrogation and waiver of the Tribe’s sovereign immunity have become *36 widely-used terms of art, well known to extend jurisdiction over individuals on tribal lands without affecting the sovereign immunity of tribes themselves. Identical or similar phrasing has been commonly part of agreements between states and tribes, and the Congressional legislation that validates them. Many of the Eastern tribes that have regained their sovereign rights through the combination of negotiated-agreement and statutory provision that I sketched above possess their lands subject to language remarkably similar to language that the majority analyzes here. See, e.g., 25 U.S.C § 1775d (“The criminal laws of [Connecticut] shall have the same force within [the Mohegan tribe’s] reservation and Indian country as such laws have elsewhere in the State.”). Other tribes around the country hold their lands subject to 25 U.S.C. §§ 1321 and 1322—the modern-day version of Public Law 280, enacted in 1968—which allow states and tribes to agree that certain tribal lands will fall under state jurisdiction. Again, the wording is nearly identical to that at issue here. See 25 U.S.C. § 1321 (providing that, upon agreement, the state’s “jurisdiction [will apply] to the same extent that such State has jurisdiction over any such offense committed elsewhere within the State,” and that the “the criminal laws of [the State] shall have the same force and effect within such Indian country or part thereof as they have elsewhere within the State”); 25 U.S.C. 1322 (similar in civil context). Given this array of laws, I see no way to limit the majority’s abrogation of the Tribe’s sovereign immunity, so that it does not also call into question the sovereign immunity claimed by the many tribes that hold lands brought under state jurisdiction by the several settlement acts or 25 U.S.C. §§ 1321-22.[14]
2. The Maynard case
We already have held that the Settlement Act and JMOU did not constitute ah abrogation or waiver of the Tribe’s sovereign immunity. Maynard v. Narragansett Indian Tribe, 984 F.2d 14 (1st Cir. 993). In Maynard, we correctly stated that any “waiver or abrogation” of tribal sovereign immunity would have to be “inferred]” from the settlement documents. Id. at 16. But such waivers cannot be inferred. Congressional abrogation of tribal sovereign immunity must be “unequivocal! ]” to be effective, and a tribe’s waiver of its immunity from state court process must be “clear.” C & L Enterprises, 532 U.S. at 418, 121 S.Ct. 1589 (internal quotation marks omitted).
As an en banc court, we have the authority to discard precedents. But 1 disagree with any suggestion that today’s holding can be squared with Maynard, The majority says that Maynard is inap-posite here because this is not a “civil suit premised on activities occurring outside the settlement lands.” As I have explained above, however, the same sovereign immunity that protects a tribe from civil lawsuits also protects it from criminal process. If anything, there is a stronger rationale for recognizing the Tribe’s sovereign immunity here than in Maynard because, while Maynard involved an in-junctive suit to stop the Tribe’s purported interference with a private landowner’s activities on his own lands, this case involves the State’s effort to execute its process on tribal lands. See Kioiva Tribe, *37 523 U.S. at 763-64, 118 S.Ct. 1700 (Stevens, J., dissenting) (noting that tribal sovereign immunity has : a stronger basis when applied to quash actions relating to activities on tribal lands). In short, Maynard cannot be distinguished to reach the result of the majority opinion. It must be overruled. Regrettably, the majority has done just that. Maynard’s analysis of the Tribe’s sovereign immunity was correct.
D. Surplusage
The majority is simply wrong that “section 1708(a) would be mere surplusage if, as the Tribe contends, it contemplates no more than that the State may exercise jurisdiction within the settlement lands subject to the constraints of tribal sovereign immunity.” The majority says that “|a]t the time Congress passed the Settlement Act, the Supreme Court already had adopted the approach of permitting the exercise of state jurisdiction within Indian lands where the exercise of such jurisdiction had not been preempted by federal law.” This statement reflects a basic misunderstanding of Indian law.
At the time Congress adopted the Settlement Act, as now, a state not expressly granted jurisdiction over Indian lands by Congress, pursuant to Public Law 280, 25 U.S.C. §§ 1321-22, 18 U.S.C. § 1162, or another similar statute, lacked criminal or civil jurisdiction over individual Indians who committed crimes on those lands. See, e.g., Ross v. Neff, 905 F.2d 1349 (10th Cir.1990) (recognizing that in the absence of an express Congressional grant of jurisdiction, a state law enforcement officer has no authority to arrest an individual Indian for a criminal offense committed on Indian land); United States v. Daye, 696 F.2d 1305, 1307 (11th Cir.1983) (same). See also Williams v. Lee, 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) (“[S]tate courts have been allowed to try non-Indians who committed crimes against each other on a reservation.... But if the crime was by or against an Indian, tribal jurisdiction or that expressly conferred on other courts by Congress has remained exclusive.”).
That is also the state of the law now. No Supreme Court case authorizes a state to extend its criminal court processes by preemption to conduct committed by individual Indians on Indian lands. The majority’s reliance on McClanahan v. State Tax Connn’n, of Arizona, 411 U.S. 164, 172, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), for the proposition that Rhode Island needed neither Congressional authorization nor the Tribe’s approval to exercise such jurisdiction over the Tribe’s lands, is misguided. The McClanahan Court expressly rejected an approach that would allow states to exercise jurisdiction over Indians on tribal lands on their own initiative. Rather, the Court said, Congress has made it clear that states cannot exert jurisdiction over Indians on Indian lands— not to mention Indian tribes—“unilaterally.” Id. at 178, 93 S.Ct. 1257. Indeed, McClanahan routinely is cited for precisely the opposite of the majority’s proposition. The case stands for the nearly irre-buttable presumption that a state cannot extend its jurisdiction to activities conducted by individual Indians, on their tribal lands, without an express grant of authority by Congress. See, Oklahoma Tax Comm'n, v. Sac & Fox Nation, 508 U.S. 114, 125-26, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993).
If there had been no section 1708(a) or similar express conferral of criminal jurisdiction, the State would not have been able to prosecute a crime committed by an Indian on the Settlement Lands. Any such crime would have been prosecuted in tribal or federal court. See 18 U.S.C, §§ 1152-56. That is the way things are done, to *38 this day, on many Western reservations over which no state ever has been granted jurisdiction. See, e.g., State v. Eagle Speaker, 300 Mont. 115, 4 P.3d 1 (2000) (recognizing that indictment for theft must be dismissed because the state lacked jurisdiction to prosecute an individual Indian who had committed a crime within a reservation).[15] Congress knew when it promulgated section 1708(a) that states lack criminal jurisdiction over individual Indians in Indian country absent an express conferral of jurisdiction by Congress. Section 1708(a), which undoes this baseline rule, is not mere “surplusage” if it does not abrogate the Tribe’s sovereign immunity.
E. Ex parte Young
As Judge Torruella indicates, the State had options for enforcing its cigarette tax laws that would have been compatible with the Tribe’s sovereign immunity. For example, the State could have sought an injunction, pursuant to Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), against the tribe’s Chief Sachem and any other relevant official, for violating the federal law giving Rhode Island the ability to tax cigarette sales on the settlement lands.
In Oklahoma Tax Comm'n, a case involving cigarette tax enforcement, the Supreme Court explicitly left open the Ex parte Young door. 498 U.S. at 514, 111 S.Ct. 905. In Santa Clara Pueblo v. Martinez, 430 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), the Court allowed a suit to enjoin enforcement of a purportedly illegal tribal ordinance to proceed against a tribal official, even though tribal sovereign immunity barred the same suit against the tribe itself. See id. at 59, 98 S.Ct. 1670. See also Puyallup Tribe, 433 U.S. at 173, 97 S.Ct. 2616. The extension of the Ex parte Young doctrine to tribal officials is well established in the courts of appeals as well. The Ninth Circuit has endorsed the idea categorically. See Dawavendewa v. Salt River Project Agr. Imp. & Power Dist., 216 F.3d 1150, 1159-60 (9th Cir.2002) (recognizing that “suits against [tribal] officials allegedly acting in contravention of federal law” are “permitted”). The Eighth Circuit has recognized that state Ex paite Young suits against tribal officials are available with “mutuality” to the same extent as tribal Ex parte Young suits against state officials. See Fond du Lac Band of Chippewa Indians v. Carlson, 68 F.3d 253, 256-57 (8th Cir.1995). The Eleventh Circuit has held similarly. See Tamiami Partners v. Miccosukee Tribe of Florida, 63 F.3d 1030, 1050-51 (11th Cir. 1995).
Here, nothing barred the State from taking the Ex part-e Young route. The search warrant was issued on the first day the tribal smoke shop opened. The search happened two days later. The officer who swore out the search warrant admitted that he had known for weeks about the Tribe’s plans to sell tax-free cigarettes. An action for injunctive relief could have addressed the State’s concerns (this was not a case where the State was seeking to recoup a large sum in uncollected taxes). Further, an Ex parte Young action would have placed this matter in federal court at the outset, where it could have been decided in peaceful fashion, according to the federal law principles that govern Indian *39 law. Instead, the State encroached upon the Tribe’s sovereign immunity .with its unwise and unlawful resort to criminal process and seizure of tribal property.
F. Conclusion.
In Kiowa, Tribe, the Supreme Court confronted a situation similar to this one. Frustrated by its inability to enforce in court a valid contract it had negotiated with an Indian tribe, a corporation asked the Court to limit tribal sovereign immunity because it was incompatible with substantive obligations to which the tribe had agreed. The Court acknowledged that the tribal sovereign immunity doctrine might be incompatible in some instances with modem tribal business endeavors. See Kiowa Tribe, 523 U.S. at 757-58, 118 S.Ct. 1700. Still, the Court refused to overrule its precedents on tribal sovereign immunity, and it rejected any suggestion that tribal sovereign immunity should only apply in matters relating to a tribe’s “core group of sovereign functions.” Maj. Op. at 26. Noting that “Congress is in a position to weigh and accommodate the competing policy concerns and reliance interests” involved in any new limitations on tribal sovereign immunity, the Court warned that “the capacity of the Legislative branch to address the issue by comprehensive legislation counsels some caution by us in this area.” Kiowa Tribe, 523 U.S. at 759, 118 S.Ct. 1700.
The majority ignores this warning and takes the apposite course. Casting aside our own precedents, it construes tribal sovereign immunity not as the Supreme Court has explained it, nor as the Tribe and State must have understood it, but in a constrained fashion that the majority believes makes sense in this case. This is a misguided effort. As the Supreme Court has repeatedly articulated the doctrine, the law of tribal sovereign immunity shielded the Tribe from the State’s criminal process. ■
I respectfully dissent.

. Public Law 280 gave state courts criminal jurisdiction over all Indian country in California and Nebraska, and most Indian country in Minnesota, Oregon, and Wisconsin, and allowed states to assert jurisdiction over many other Indian lands without tribal consent. The criminal jurisdiction provision in the law provides that relevant states
shall have jurisdiction over offenses committed by or against Indians in the frele-vant] areas of Indian country ... to the same extent that such State has jurisdiction over offenses committed elsewhere within the state, and the criminal laws of such State shall have the same force and effect within such Indian country as they have elsewhere within the State
Public Law 83-280, 67 Stat. 588 (1953).

. The majority claims that, because this case is “idiosyncratic,” we can ignore the Maine Indian Claims Settlement Act, 25 U.S.C. §§ 1725(a) & (d), which was adopted in 1980 and contains explicit abrogations of tribal sovereign immunity. In the Maine act, Congress made clear that certain “Indian nations, or tribes or bands of Indians” would be "subject to the civil and criminal jurisdiction of the State.” 25 U.S.C. § 1725(a). Congress also explicitly provided for all Maine tribes to “sue and be sued ... to that same extent as any other entity or person residing in the State of Maine." 25 U.S.C. § 1725(d). Contrary to what the majority suggests, that statute—which speaks precisely to the question of tribal sovereign immunity—adds considerable doubt to any assertion that Congress intended to abrogate Narragansett tribal immunity in the nearly contemporaneous but very differently-worded Settlement Act.

. In reality, the Congressional findings of fact that accompanied the Settlement Act indicate that the State’s most important “quid pro quo” was the Tribe’s agreement not to institute any further land claims suits, so that “clouds on titles” would be removed, and the "severe economic hardships" born by non-Indians who held lands near the contested area would end. See 25 U.S.C. §§ 1701(b), (c).

.The majority places substantial reliance on the Supreme Court's statement in C & L Enterprises v. Citizen Band Potawatomi Indian Tribe, 532 U.S. 411, 418, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001), that “talismanic” phrases are not required to effectuate a tribal waiver of sovereign immunity. The cases applying C & L have recognized that a waiver of sovereign immunity requires some reference to the tribe itself (rather than to its lands or members). See, e.g., Building Inspector and Zoning Officer of Aquinnah v. Wampanoag Aquinnah Shellfish Hatchery Corp., 443 Mass. 1, 818 N.E.2d 1040, 1048-49 (2004) (holding that even though specialized phrasing was not employed, tribe clearly waived its sovereign immunity from zoning enforcement by agreeing to hold the relevant lands “in the same manner ... as any other Massachusetts corporation”). The problem here is not a choice of language, but the lack of any language in any of the relevant documents that speaks to jurisdiction over the Tribe.

. The majority places great emphasis on the fact that the State’s jurisdiction over the Tribe's lands was "based on 'the mutual consent of all parties,' ” Maj. Op. at 28 (quoting H.R.Rep. No. 95-1143, at 11). But this fact does not distinguish this case from the run of the mill. The mutual consent of all the involved parties underlies each of these post-1968 conferrals of jurisdiction over Indian lands.

. Nevada v. Hicks, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), does not change this principle in the least. Hicks merely clarified that a tribal court did not have jurisdiction over an Indian's tort claim against non-Indian defendants. The conduct subject to the tort claim in Hicks, moreover, was a state’s prosecution of an individual Indian for off-reservation conduct. See id. at 358-59, 121 S.Ct. 2304; Id. at 375, 121 S.Ct. 2304 (Souter, J., concurring).