IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 35787-2008

| | | |
|---|---|---|
| WENDY KNOX and RICHARD DOTSON, | ) | |
| | ) | Pocatello, September 2009 Term |
| Plaintiffs-Appellants, | ) | |
| | ) | 2009 Opinion No. 144 |
| v. | ) | |
| | ) | Filed: November 27, 2009 |
| STATE OF IDAHO, ex rel. C. L. OTTER, | ) | |
| Governor; BEN YSURSA, Secretary of State; | ) | Stephen W. Kenyon, Clerk |
| and LAWRENCE WASDEN, Attorney | ) | |
| General, | ) | |
| | ) | |
| Defendants-Respondents. | ) | |

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, in and for Bingham County. The Hon. Darren B. Simpson, District Judge.

The judgment of the district court is affirmed.

Thomsen Stephens Law Offices, PLLC, Idaho Falls, for appellants. Jason T. Wood argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondents. Clay R. Smith, Deputy Attorney General, argued.

---

EISMANN, Chief Justice.

This is an action seeking to have Idaho Code §§ 67-429B and 67-429C declared unconstitutional. The district court dismissed this action on the ground that the Plaintiffs lacked standing. It concluded that the relief sought would not redress the Plaintiffs' alleged injuries. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

Because this case involves State jurisdiction over the actions of Native Americans on their reservations, we will begin by reviewing that jurisdiction.

**Early decisions of the United States Supreme Court.** In *Worcester v. Georgia*, 31 U.S. 515 (1832), Worcester, a citizen of Vermont, had been convicted of violating a Georgia statute

making it illegal for "white persons" to reside "within the limits of the Cherokee nation without a license or permit from his excellency the governor" and without having taken a required oath. *Id.* at 542. In declaring the Georgia statute void, the Supreme Court held that the laws of Georgia had no force and effect in the Cherokee nation.

> The Cherokee nation, then, is a distinct community occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of congress. The whole intercourse between the United States and this nation, is, by our constitution and laws, vested in the government of the United States.
>
> The act of the state of Georgia, under which the plaintiff in error was prosecuted, is consequently void, and the judgment a nullity.

*Id.* at 561.

In *In re Kansas Indians*, 72 U.S. 737 (1866), and *In re New York Indians*, 72 U.S. 761, (1866), the Supreme Court held that Kansas and New York did not have authority to tax Indian lands within their respective states. In *United States v. Kagama*, 118 U.S. 375 (1886), the Court held that the federal government had authority to criminalize conduct by Indians committed on the reservation. In so holding, the Court stated, "These Indian tribes *are* the wards of the nation. . . . They owe no allegiance to the states, and receive from them no protection." *Id.* at 383-84 (emphasis in original).

In *Ex parte Kan-gi-shun-ca*, 109 U.S. 556 (1883), the Court addressed whether a district court in the territory of Dakota had jurisdiction to try an Indian for the murder of another Indian committed on an Indian reservation. The district court had two distinct jurisdictions. "As a territorial court it administer[ed] the local law of the territorial government; as invested by act of congress with jurisdiction to administer the laws of the United States, it ha[d] all the authority of circuit and district courts." *Id.* at 560. The Court noted that "by section 1839 Rev. St., it [the Sioux reservation] is excepted out of and constitutes no part of [Dakota] territory." *Id.* at 559. The Court explained that the object of that statute was "to exclude the jurisdiction of any state or territorial government over Indians within its exterior lines, without their consent, where their rights have been reserved and remain unextinguished by treaty." *Id.* Thus, the issue was whether the district court exercising its jurisdiction to administer the laws of the United States had jurisdiction to try the defendant for murder. The Supreme Court ultimately held that

2

Congress had not given it jurisdiction to try a crime committed by one Indian against the person or property of another. *Id.* at 571-72. After the decision in *Ex parte Kan-gi-shun-ca*, Congress enacted legislation making Indians subject to territorial laws for the crimes of murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny and granting jurisdiction to territorial courts to try such crimes. *Ex parte Gon-shay-ee*, 130 U.S. 343, 349-350 (1889).

There were three cases decided by the United States Supreme Court that involved jurisdictional issues arising in Idaho. First, in *Harkness v. Hyde*, 98 U.S. 476 (1878), the Supreme Court held that the service of a summons and complaint by an Idaho sheriff upon a defendant at his place of residence on the Shoshone reservation was void. Relying upon the Organic Act from the Territory of Idaho, the Court stated,

> The act of Congress of March 3, 1863, organizing the Territory of Idaho, provides that it shall not embrace within its limits or jurisdiction any territory of an Indian tribe without the latter's assent, but that "all such territory shall be excepted out of the boundaries, and constitute no part of the Territory of Idaho," until the tribe shall signify its assent to the President to be included within the Territory.[1]

*Id.* at 477.

The Court then noted, "No assent was given by this treaty that the territory constituting the reservation should be brought under the jurisdiction, or be included within the limits, of Idaho." *Id.* at 478. The Court concluded, "The territory reserved [for the Shoshone reservation], therefore, was as much beyond the jurisdiction, legislative or judicial, of the government of Idaho, as if it had been set apart within the limits of another country, or of a foreign State." *Id.*

The second case was *Langford v. Monteith*, 102 U.S. 145 (1880), decided two years later. In that case the Court had before it an unlawful detainer action brought before a territorial justice

---

[1] The relevant portion of the Organic Act provided as follows:

> [T]hat nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the Indians in said territory, so long as such right shall remain inextinguished by treaty between the United States and such Indians, or include any territory, which, by treaty with the Indian tribes, is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries and constitute no part of the territory of Idaho, until said tribe shall signify their assent to the President of the United States to be included within said territory, . . . .

12 Stat. 808, 809 (1863).

of the peace involving two "white men" disputing the right to possession of buildings and grounds located on the Nez Perce Reservation. One of the issues raised on appeal was whether the property within the Reservation was part of the Idaho Territory. In addressing that issue, the Court stated that the decision in *Harkness* was based upon the Court "laboring under a mistake" that the treaty with the Shoshones "contains a clause excluding the lands of the tribe from territorial or State jurisdiction." *Id.* at 147. The Court then stated that because there was no such clause in the treaty with the Nez Perce, "the lands held by them are a part of the Territory and subject to its jurisdiction, so that process may run there, however *the Indians themselves may be exempt from that jurisdiction.*" *Id.* at 147 (emphasis added).

The *Langford* Court also gave as an additional rationale for its decision, "as this is a suit between white men, citizens of the United States, the justice of the peace had jurisdiction of the parties." *Id.* Soon afterward, the Supreme Court held in *United States v. McBratney*, 104 U.S. 621 (1881), that the State of Colorado, not the United States, had jurisdiction to try a white man for the murder of another white man committed on the Ute Reservation. In so holding, it stated, "The State of Colorado . . . has acquired criminal jurisdiction over its own citizens and other white persons throughout the whole of the territory within its limits, including the Ute Reservation, and that reservation is no longer within the sole and exclusive jurisdiction of the United States." *Id.* at 624.

The third case was *Utah & Northern Railway Co. v. Fisher*, 116 U.S. 28 (1885). The railroad, a Utah corporation, had tracks crossing the Fort Hall Indian Reservation located in Oneida County in the Idaho Territory. Pursuant to territorial law, the County sought to tax railroad property located within the boundaries of the Reservation. The Supreme Court held that the railroad's property was subject to such tax. The Court summarized some of the provisions in the treaty with the Shoshones and Bannocks as follows:

> Among other things, it was stipulated that the reservation should be set apart for their absolute and undisturbed use and occupation, and for such other friendly tribes or individual Indians to whose admission from time to time they and the United States might consent; and that no person should ever be permitted by the United States to pass through, settle upon, or reside on the reservation, except those designated in the treaty, and such officers, agents, and employes of the government as might be authorized to enter therein in the discharge of duties enjoined by law. The treaty also provided for the punishment, according to the laws of the United States, of any person among the Indians who should commit a

4

wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States, and at peace therewith; . . . .

*Id.* at 30-31. The railroad argued "that these stipulations cannot be carried out, if the laws of the territory are enforced on the reservation." *Id*. at 31. The Court agreed that upholding Territorial jurisdiction in all cases and to its fullest extent would conflict with the treaty provisions, but permitting the Territory to tax the railroad's property would not do so. The Court stated:

> To uphold that jurisdiction in all cases and to the fullest extent would undoubtedly interfere with the enforcement of the treaty stipulations, and might thus defeat provisions designed for the security of the Indians. But it is not necessary to insist upon such general jurisdiction for the Indians to enjoy the full benefit of the stipulations for their protection. The authority of the territory may rightfully extend to all matters not interfering with that protection.

*Id*. The Court concluded, "If the plaintiff lawfully constructed and now operates a railroad through the reservation, it is not perceived that any just rights of the Indians, under the treaty can be impaired by taxing the road and property used in operating it." *Id*. at 31-32. Thus, the Court held that the Idaho Territory could tax non-Indian property on the Reservation where it would not impair any just rights of the Indians.[2]

**Recent decisions of the United States Supreme Court.** The early view of the sovereignty of an Indian reservation announced in *Worcester v. Georgia*, 31 U.S. 515 (1832), began to change with the decision in *Utah & Northern Railway Co. v. Fisher*, 116 U.S. 28 (1885). As summarized in *Organized Village of Kake v. Egan*, 369 U.S. 60, 72 (1962):

> The general notion drawn from Chief Justice Marshall's opinion in *Worcester v. Georgia*, 6 Pet. 515, 561, 8 L.Ed. 483 [1832]; *The Kansas Indians*, 5 Wall. 737, 755-757, 18 L.Ed. 667 [1866]; and *The New York Indians*, 5 Wall. 761, 18 L.Ed. 708 [1866], that an Indian reservation is a distinct nation within whose boundaries state law cannot penetrate, has yielded to closer analysis when confronted, in the course of subsequent developments, with diverse concrete situations. By 1880 the Court no longer viewed reservations as distinct nations. On the contrary, it was said that a reservation was in many cases a part of the surrounding State or Territory, and subject to its jurisdiction except as forbidden

---

[2] The Court also quoted the provision in the Organic Act of the Territory of Idaho that the territory would not "include within its boundaries or jurisdiction any lands which, by treaty with the Indian tribes, were not, without their consent, to be included within the limits or jurisdiction of any state or territory." *Utah & N. Ry. Co. v. Fisher*, 116 U.S. at 28, 29-30 (1885). The Court stated that this proviso "excludes from the limits and jurisdiction of Idaho only such lands as by treaty were not to be included without the consent of the Indians. . . . There was at that time no treaty with the Indians that the lands, which might be reserved to them, should be thus excluded from the limits and jurisdiction of any state or territory." *Id.* at 30.

5

by federal law.  *Utah & Northern R. Co. v. Fisher*, 116 U.S. 28, 31, 6 S.Ct. 246, 247, 29 L.Ed. 542 [1885].

However, the tribes still retain many aspects of sovereignty regarding their tribal land and tribal members within the reservation.  As the Supreme Court stated in *Plains Commerce Bank v. Long Family Land and Cattle Co.*, ___ U.S. ___, 128 S.Ct. 2709, 2718 (2008) (citations omitted):

> For nearly two centuries now, we have recognized Indian tribes as "distinct, independent political communities," qualified to exercise many of the powers and prerogatives of self-government.  We have frequently noted, however, that the "sovereignty that the Indian tribes retain is of a unique and limited character."  It centers on the land held by the tribe and on tribal members within the reservation.

"The federal policy favoring tribal self-government operates even in areas where state control has not been affirmatively pre-empted by federal statute.  '[A]bsent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.'"  *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987) (quoting *Williams v. Lee*, 358 U.S. 217, 220 (1959)).

**Article XXI, § 19, of the Idaho Constitution.**  In 1889, Congress enacted the Enabling Act under which the States of Montana, North Dakota, South Dakota, and Washington were admitted into the Union.  25 Stat. 676 (1889).  Section 4 of the Enabling Act required that the constitutional conventions in each of the territories "shall provide, by ordinances irrevocable without the consent of the United States and the people of said States," four provisions.  *Id*. at 677.  The second provision included the following requirement:

> That the people inhabiting said proposed States do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States; . . . .

*Id.*  The above-quoted provision reflected the historical restriction that "Indian territories were generally deemed beyond the legislative and judicial jurisdiction of the state governments."  *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engr.*, 476 U.S. 877, 879 (1986).

The Idaho constitutional convention met during 1889 after the enactment of the Enabling Act for the States of Montana, North Dakota, South Dakota, and Washington. Undoubtedly because of the above-quoted requirement in that Enabling Act, the Idaho constitutional convention included in Article XXI, § 19, of the Idaho Constitution the following provision:

> And the people of the state of Idaho do agree and declare that we forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indians or Indian tribes; and until the title thereto shall have been extinguished by the United States, the same shall be subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States; . . . .

The requirement that the "Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States" does not mean the *exclusive* jurisdiction and control. *Draper v. United States*, 164 U.S. 240 (1896) (after Montana became a state, it could still punish crimes committed on an Indian reservation that were not committed by Indians or against Indians). As stated by the Supreme Court in *Organized Village of Kake v. Egan*, 369 U.S. 60, 67-68 (1962):

> [T]he retention of 'absolute' federal jurisdiction over Indian lands adopts the formula of nine prior statehood Acts. Indian lands in Arizona remained 'under the absolute jurisdiction and control' of the United States, 36 Stat. 557, 569; yet in *Williams v. Lee*, 358 U.S. 217, 220, 223, 79 S.Ct. 269, 270, 272, 3 L.Ed.2d 251 [1959], we declared that the test of whether a state law could be applied on Indian reservations there was whether the application of that law would interfere with reservation self-government. The identical language appears in Montana's admission Act, 25 Stat. 676, 677, yet in *Draper v. United States*, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419 [1896], the Court held that a non-Indian who was accused of murdering another non-Indian on a Montana reservation could be prosecuted only in the state courts. The Montana statute applies also to North Dakota, South Dakota, and Washington. Identical provisions are found in the Acts admitting New Mexico (36 Stat. 557, 558-559) and Utah (28 Stat. 107, 108), and in the Constitutions of Idaho (1890, Art. 21, § 19) and Wyoming (1890, Art. 21, § 26), which were ratified by Congress (26 Stat. 215 (Idaho); 26 Stat. 222 (Wyoming)).
> *Draper* and *Williams* indicate that 'absolute' federal jurisdiction is not invariably exclusive jurisdiction.

**Jurisdiction granted by Public Law 280.** In 1953, Congress enacted Public Law 280, 67 Stat. 588 (1953) (codified as 18 U.S.C. § 1162 and 28 U.S.C. § 1360). "Public Law 280 represents the primary expression of federal policy governing the assumption by States of civil

and criminal jurisdiction over the Indian Nations." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engr.*, 476 U.S. 877, 884 (1986). It was "the first federal jurisdictional statute of general applicability to Indian reservation lands." *Washington v. Confederated Bands and Tribes of Yakima Indian Nation*, 439 U.S. 463, 471 (1979). It granted California, Minnesota, Nebraska, Oregon, and Wisconsin criminal jurisdiction "over offenses committed by or against Indians in the [specified] areas of Indian country . . . to the same extent that such State has jurisdiction over offenses committed elsewhere within the State" and civil jurisdiction over "civil causes of action between Indians or to which Indians are parties which arise in the [specified] areas of Indian country . . . to the same extent that such State has jurisdiction over other civil causes of action." 67 Stat 588, 588-89 (1953). To the remaining States it gave an option to assume jurisdiction over criminal offenses and civil causes of action in Indian country "at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof." 67 Stat. 588, 590 (1953) (repealed 1968). In 1963, Idaho enacted Idaho Code § 67-5101 under which the State assumed jurisdiction in Indian country over seven classifications of civil disputes and criminal offenses. *State v. Marek*, 112 Idaho 860, 865-66, 736 P.2d 1314, 1319-20 (1987); Ch. 58, § 1, 1963 Idaho Sess. Laws 224, 225.

In *State v. Marek*, the defendant argued that Idaho Code § 67-5101 was invalid because the State could not assume jurisdiction over the matters described in the statute without first amending Article XXI, § 19, of the Idaho Constitution. This Court rejected that argument, stating as follows:

> It is correct that our Constitution, as adopted in pertinent part, provides, "said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States; . . . ." Nevertheless, it is clear that under the literal language of P.L. 280, a portion of the "absolute jurisdiction and control of the congress of the United States" was ceded with respect to certain criminal offenses to the states, as the states might assume "by affirmative legislative action." Hence, we hold that while our Constitution may have provided for congressional control and jurisdiction over Indian lands, it did not, and could not, prohibit the ceding of part or all of such control and jurisdiction back to the states. Such ceding of partial jurisdiction and control was accomplished by the Congress if the state would consent to accept such jurisdiction and control by legislative enactment. Idaho did so accept that ceding by the Congress through legislative action.

112 Idaho at 866, 736 P.2d at 1320.

Eight years earlier the United States Supreme Court had addressed the issue of whether Public Law 280 required the modification of a constitutional provision like Article XXI, § 19, in order for the state to assume jurisdiction under Public Law 280. In *Washington v. Confederated Bands and Tribes of Yakima Indian Nation*, 439 U.S. 463 (1979), the Yakima Nation brought an action challenging the State of Washington's partial assertion of jurisdiction pursuant to Public Law 280. The Tribe contended that before assuming civil and criminal jurisdiction on the Yakima Reservation, the State of Washington was required to amend Article XXVI in its Constitution, which is similar to Article XXI, § 19, of the Idaho Constitution.[3] The Supreme Court held, "We conclude that § 6 of Pub.L. 280 does not require disclaimer States [those with constitutional provisions disclaiming jurisdiction over Indian lands] to amend their constitutions to make an effective acceptance of jurisdiction." 439 U.S. at 493.

Idaho Code § 67-5101 provides as follows:

> The state of Idaho, in accordance with the provisions of 67 Statutes at Large, page 589 (Public Law 280) hereby assumes and accepts jurisdiction for the civil and criminal enforcement of state laws and regulations concerning the following matters and purposes arising in Indian country located within this state, as Indian country is defined by title 18, United States Code 1151, and obligates and binds this state to the assumption thereof:
> A. Compulsory school attendance
> B. Juvenile delinquency and youth rehabilitation
> C. Dependent, neglected and abused children
> D. Insanities and mental illness
> E. Public assistance
> F. Domestic relations
> G. Operation and management of motor vehicles upon highways and roads maintained by the county or state, or political subdivisions thereof.

---

[3] Article XXVI of the Washington Constitution provides as follows:
COMPACT WITH THE UNITED STATES
The following ordinance shall be irrevocable without the consent of the United States and the people of this state:
. . . .
Second. That the people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries of this state, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States . . . .

**State jurisdiction over gambling on Indian reservations.** The Cabazon and Morongo Bands of Mission Indians in California each operated bingo games on their respective reservations. In addition, the Cabazon Band opened a card club at which draw poker and other card games were played. Both the bingo games and the card games were played primarily by non-Indians who came onto the reservations. California sought to require the Bands to comply with state law in operating the bingo games and to ban the card games pursuant to a county ordinance. The Supreme Court held that Public Law 280 did not grant California jurisdiction to enforce its laws on the reservations. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 212 (1987). The Court had previously construed Public Law 280 "to grant States jurisdiction over private civil litigation involving reservation Indians in state court, but not to grant general civil regulatory authority." *Id*. at 208. Therefore, the California laws at issue could apply to the reservations only if they were criminal in nature. "California was granted broad criminal jurisdiction over offenses committed by or against Indians within all Indian country within the State." *Id*. at 207. Whether the laws were criminal or civil in nature depended upon whether they were prohibitory or regulatory. *Id*. at 209-10. In making that determination, it was relevant that California operated a state lottery and permitted pari-mutuel horserace betting and bingo. The Supreme Court held, "In light of the fact that California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery, we must conclude that California regulates rather than prohibits gambling in general and bingo in particular." *Id*. at 211. It did not matter that the laws carried criminal penalties. "[T]hat an otherwise regulatory law is enforceable by criminal as well as civil means does not necessarily convert it into a criminal law within the meaning of Pub.L. 280." *Id*.

Under Idaho Code § 67-5101, Idaho has not assumed criminal jurisdiction relating to gambling on Indian reservations located within the State, nor has it assumed jurisdiction over civil causes of action related to gambling. In 1968, Public Law 280 was amended to require that Indian Tribes consent to the State assumption of jurisdiction over criminal offenses or civil causes of action. 82 Stat. 73, 78-80 (1968) (codified as 25 U.S.C. §§ 1321, 1322 & 1326). Jurisdiction assumed prior to this amendment was not affected. 82 Stat. 73, 79 (1968). Therefore, Idaho cannot expand its jurisdiction without the consent of the affected Tribes.

In *Cabazon*, the Supreme Court acknowledged the possibility that California could have jurisdiction over the reservations even in the absence of the congressional consent set forth in Public Law 280. The Court stated:

> Our cases, however, have not established an inflexible *per se* rule precluding state jurisdiction over tribes and tribal members in the absence of express congressional consent. "[U]nder certain circumstances a State may validly assert authority over the activities of nonmembers on a reservation, and ... in exceptional circumstances a State may assert jurisdiction over the on-reservation activities of tribal members."

480 U.S. at 214-15 (footnote omitted; quoting from *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 331-32 (1983)). The Court cited two cases in which it had found state jurisdiction in the absence of express congressional authorization. Both cases allowed the states to require tribal smokeshops on Indian reservations to collect state sales taxes from their non-Indian customers and to maintain records of sales to Indians and non-Indians. With respect to those cases, the Court stated, "The State's interest in assuring the collection of sales taxes from non-Indians enjoying the off-reservation services of the State was sufficient to warrant the minimal burden imposed on the tribal smokeshop operators." 480 U.S. at 216.

California argued that its interest in preventing organized crime from infiltrating tribal gambling justified its authority to require the Bands to comply with California law. The Supreme Court rejected that argument, stating, "We conclude that the State's interest in preventing the infiltration of the tribal bingo enterprises by organized crime does not justify state regulation of the tribal bingo enterprises in light of the compelling federal and tribal interests supporting them. State regulation would impermissibly infringe on tribal government, and this conclusion applies equally to the county's attempted regulation of the Cabazon card club." *Id*. at 221-22. One commentator has concluded, "The preemption analysis of *Cabazon* made clear that states permitting gambling would not be able to articulate a sufficiently strong state interest to outweigh the countervailing federal and tribal interests." *Cohen's Handbook of Federal Indian Law* 865 (2005 ed.) (footnotes omitted).

**Indian Gaming Regulatory Act.** The year following the decision in *Cabazon*, Congress enacted the Indian Gaming Regulatory Act ("IGRA"), 102 Stat. 2467 (1988) (codified as amended at 25 U.S.C. §§ 2701-2721; 18 U.S.C. §§ 1166-1168). The purpose of IGRA as stated in 25 U.S.C. § 2702 is as follows:

**(1)** to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

**(2)** to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

**(3)** to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

IGRA divides gambling into three classes of games. Class I games are defined as "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." 25 U.S.C. § 2703(6). "Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes and shall not be subject to the provisions of [IGRA]." 25 U.S.C. § 2710(a)(1).

Class II games are defined as "the game of chance commonly known as bingo . . . including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo, and [certain] card games." 25 U.S.C. § 2703(7)(A). Class II games do not include "any banking card games" or "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." 25 U.S.C. § 2703(7)(B). "Any class II gaming on Indian lands shall continue to be within the jurisdiction of the Indian tribes, but shall be subject to the provisions of [IGRA]." 25 U.S.C. § 2710(a)(2).

Class III games are "all forms of gaming that are not class I gaming or class II gaming." 25 U.S.C. § 2703(8). Class III gaming is lawful on Indian lands only if such activities are: (1) authorized by a proper ordinance or resolution that was adopted by the governing body of the Indian tribe having jurisdiction over the lands and approved by the chairman of the National Indian Gaming Commission; (2) located in a State that permits such gaming for any purpose by any person, organization, or entity; and (3) conducted in conformity with a Tribal-State compact that was entered into under IGRA and is in effect. 25 U.S.C. § 2710(d)(1). The Secretary of the

Interior must approve the compact,[4] and it does not take effect until notice of such approval has been published by the Secretary in the Federal Register. 25 U.S.C. § 2710 (d)(8) & (3)(B).

**Amendment of Article III, § 20, of the Idaho Constitution.** On November 3, 1992, the voters in Idaho approved an amendment to Article III, § 20, of the Idaho Constitution. As amended, it reads as follows:

> (1) Gambling is contrary to public policy and is strictly prohibited except for the following:
>
> a. A state lottery which is authorized by the state if conducted in conformity with enabling legislation; and
>
> b. Pari-mutuel betting if conducted in conformity with enabling legislation; and
>
> c. Bingo and raffle games that are operated by qualified charitable organizations in the pursuit of charitable purposes if conducted in conformity with enabling legislation.
>
> (2) No activities permitted by subsection (1) shall employ any form of casino gambling including, but not limited to, blackjack, craps, roulette, poker, bacarrat, keno and slot machines, or employ any electronic or electromechanical imitation or simulation of any form of casino gambling.
>
> (3) The legislature shall provide by law penalties for violations of this section.
>
> (4) Notwithstanding the foregoing, the following are not gambling and are not prohibited by this section:
>
> a. Merchant promotional contests and drawings conducted incidentally to bona fide nongaming business operations, if prizes are awarded without consideration being charged to participants; and
>
> b. Games that award only additional play.

**Tribal-State compact.** In 1993, the legislature enacted Idaho Code § 67-429A authorizing the governor or his designee to represent the State in any negotiations to enter into a Tribal-State compact under IGRA. Ch. 408, § 2, 1993 Idaho Sess. Laws 1500, 1500-01. On February 18, 2000, the State of Idaho entered into a compact with the Shoshone-Bannock Tribes ("Tribes").[5] The Tribal-State compact ("Compact") authorized Class III gaming as follows:

> 4. Authorized Class III Gaming
> Class III Gaming shall be authorized consistent with the following:
> a. _Gaming Authorized_. Following approval of this Compact as provided in the Act [IGRA], the Tribes may operate in its gaming facilities

---

[4] If the Secretary does not approve or disapprove the compact within 45 days after it has been submitted to the Secretary, it is considered approved, but only to the extent it is consistent with IGRA. 25 U.S.C. § 2710(d)(8)(C).

[5] Although we refer to the Shoshone-Bannock Tribes by their plural name, they constitute a single recognized Indian tribe.

13

located on Indian Lands any gaming activity that the State of Idaho "permits for any purpose by any person, organization, or entity," as the phrase is interpreted in the context of the Indian Gaming Regulatory Act. The Tribes may not operate any other form of Class III gaming activity.

Compact, § 4. The parties to the Compact could not agree as to what types of gaming were permissible under the above-quoted provision. The State took the position that the only types of Class III gaming authorized by the Compact were "a lottery, pari-mutual [sic] betting and bingo or raffle games conducted in conformity with enabling legislation" and that "the electronic gaming currently conducted by the Tribes is an imitation of casino games and prohibited by Idaho and federal law." Compact, § 3(o) & (p). The Tribes took the position that "all forms of gaming except sports-betting" was authorized, or, in the alternative, the Tribes are entitled to offer "electronic facsimiles of any lottery game which can reasonably be defined as gaming owned and operated by governmental entities, or as games where the state/owner does not have a stake in the outcome of the game of chance." Compact, § 3(q) & (r). The parties agreed that they would waive their respective sovereign immunities so that they could resolve that issue by a declaratory judgment action in federal court. Compact, § 5(b).

**Proposition One.** On November 5, 2002, the voters of Idaho approved an initiative designated "Proposition One," resulting in the enactment of Idaho Code §§ 67-429B and 67-429C.[6] Proposition One declared that "Indian tribes are authorized to conduct gaming using

---

[6] These statutes are as follows:

> 67-429B. Authorized tribal video gaming machines. (1) Indian tribes are authorized to conduct gaming using tribal video gaming machines pursuant to state-tribal gaming compacts which specifically permit their use. A tribal video gaming machine may be used to conduct gaming only by an Indian tribe, is not activated by a handle or lever, does not dispense coins, currency, tokens, or chips, and performs only the following functions:
> > (a) Accepts currency or other representative of value to qualify a player to participate in one or more games;
> > (b) Dispenses, at the player's request, a cash out ticket that has printed upon it the game identifier and the player's credit balance;
> > (c) Shows on a video screen or other electronic display, rather than on a paper ticket, the results of each game played;
> > (d) Shows on a video screen or other electronic display, in an area separate from the game results, the player's credit balance;
> > (e) Selects randomly, by computer, numbers or symbols to determine game results; and
> > (f) Maintains the integrity of the operations of the terminal.
> > (2) Notwithstanding any other provision of Idaho law, a tribal video gaming machine as described in subsection (1) above is not a slot machine or an electronic or electromechanical imitation or simulation of any form of casino gambling.

14

tribal video gaming machines pursuant to state-tribal gaming compacts which specifically permit their use," it defined what was a tribal video gaming machine under the statute, and it declared that such gaming machines were neither slot machines nor electronic or electromechanical imitations or simulations of any form of casino gambling. I.C. § 67-429B.

**Federal lawsuit.** The Tribes and Idaho filed lawsuits seeking a declaratory judgment as to what types of Class III gaming were permitted on the Fort Hall Indian Reservation. While the lawsuit was pending in the trial court, the voters of Idaho approved Proposition One. On appeal, the United States Court of Appeals for the Ninth Circuit held that Idaho Code § 67-429B permitted the Coeur d'Alene, Kootenai, and Nez Perce Tribes to legally operate tribal video gaming machines and that, by the terms of the Compact, it was automatically amended to permit the Tribes to operate the same type of Class III games. *Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095, 1098-99 (9th Cir. 2006). Therefore, the court concluded that the Tribes are

---

67-429C. Amendment of state-tribal gaming compacts. (1) Any tribe with an existing state-tribal gaming compact may amend its compact through the procedure set forth in subsection (2) below to incorporate all of the following terms:

(a) As clarified by this compact amendment, the tribe is permitted to conduct gaming using tribal video gaming machines as described in Section 67-429B, Idaho Code.

(b) In the 10 years following incorporation of this term into its compact, the number of tribal video gaming machines the tribe may possess is limited to the number of tribal video gaming machines possessed by the tribe as of January 1, 2002, plus 25% of that number; provided, however, that no increase in any single year shall exceed 5% of the number possessed as of January 1, 2002. Thereafter, the tribe may operate such additional tribal video gaming machines as are agreed to pursuant to good faith negotiations between the state and the tribe under a prudent business standard.

(c) To the extent such contributions are not already required under the tribe's existing compact, the tribe agrees to contribute 5% of its annual net gaming income for the support of local educational programs and schools on or near the reservation. The tribe may elect to contribute additional sums for these or other educational purposes. Disbursements of these funds shall be at the sole direction of the tribe.

(d) The tribe agrees not to conduct gaming outside of Indian lands.

(2) To amend its compact to incorporate the terms set forth in subsection (1) above, a tribe shall deliver to the Secretary of State a tribal resolution signifying the tribe's acceptance of the terms. Immediately upon delivery of such tribal resolution to the Secretary of State, (a) the tribe's state-tribal gaming compact shall be deemed amended to incorporate the terms; (b) the tribe's compact as so amended shall be deemed approved by the state in accordance with Section 67-429A, Idaho Code, without the need for further signature or action by the executive or legislative branches of state government, and (c) except to the extent federal government approval is required, the newly incorporated compact terms shall be deemed effective immediately.

(3) Nothing in this section shall be construed to (a) indicate that any gaming activity currently conducted by any tribe is unauthorized or otherwise inappropriate under Idaho law or the tribe's existing compact, or (b) prohibit a tribe from negotiating with the state for an initial compact or a compact amendment regarding tribal video gaming machines or any other matter through a procedure other than the procedure specified in subsection (2) above or which contains terms different than those specified in subsection (1) above.

authorized to conduct tribal video gaming on the Fort Hall Reservation. *Id*. at 1102. In the federal litigation, the State did not challenge the constitutionality of any portion of Proposition One.

**Proceedings in the district court.** On March 13, 2008, Wendy Knox and Richard Dotson filed this action seeking to have Idaho Code §§ 67-429B and 67-429C declared unconstitutional as violating Article III, § 20, of the Idaho Constitution. In their amended complaint they alleged that they had become addicted to gambling by playing the video gaming machines at the Fort Hall Casino; that they gambled almost exclusively at the Casino because of its close proximity to their homes; that they played only the video gaming machines at the Casino; that they both developed clinical and devastating addictions to gambling from playing those machines; and that because of their gambling addictions they have each lost tens of thousands of dollars and suffered stress, anxiety, humiliation, and emotional distress.

The State moved to dismiss this action on the ground that the court could not grant the Plaintiffs any relief to redress their claimed injuries. The State contended that the Plaintiffs could not obtain relief without amending the Compact and that the district court could not grant that relief. The Tribes would be necessary parties in any action to amend the Compact, and they are immune from suit by Idaho or its citizens without the Tribes' consent or congressional abrogation of that immunity. Citing *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536 (8th Cir. 1996), the State also argued that the Plaintiffs have no state-law claims because IGRA completely preempts state laws regarding gaming on Indian lands.

The district court granted the State's motion to dismiss on the ground that it was speculative whether the Plaintiffs' requested relief (invalidation of Idaho Code §§ 67-429B and 67-429C) would redress their claimed injuries by having the video gaming machines removed from the Fort Hall Casino. The court reasoned as follows:

> Under this factual scenario, should the Plaintiffs attain the ultimate relief they seek, then the Tribe and the State will fall back upon their Compact, which allows the Tribe to operate any gaming activity that the State permits for any purpose by any person, organization, or entity. Either the State or the Tribe may request renegotiation of the Compact. Whether or how the State or the Tribe might return to the U.S. District Court for a finding as to the constitutionality of tribal video gaming machines is a question of interpretation of the Compact, which is not before this Court. Whether or not the State will seek to pass other legislation, or to amend the Idaho Constitution, is highly speculative.

16

. . . . This Court cannot speculate as to the outcome of any relitigation or renegotiation of the Compact, or any efforts on the part of the State to introduce different statutes or even a constitutional amendment. A declaration that I.C. § 67-429B and § 67-429C are unconstitutional does not, without other, intervening events, rid the Plaintiffs of the proximity of the slot machines to which they claim to be addicted.

The district court entered a judgment dismissing this action, and the Plaintiffs timely appealed.

## II. ANALYSIS

"The doctrine of standing focuses on the party seeking relief and not on the issues the party wishes to have adjudicated." *Miles v. Idaho Power Co.*, 116 Idaho 635, 641, 778 P.2d 757, 763 (1989). To satisfy the requirement of standing litigants must allege an injury in fact, a fairly traceable causal connection between the claimed injury and the challenged conduct, and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury. *Troutner v. Kempthorne*, 142 Idaho 389, 391, 128 P.3d 926, 928 (2006).

"Standing is a preliminary question to be determined by this Court before reaching the merits of the case." *Young v. City of Ketchum*, 137 Idaho 102, 104, 44 P.3d 1157, 1159 (2002). For the purposes of the standing analysis, we will assume that Idaho Code §§ 67-429B and 67-429C violate Article III, § 20, of the Idaho Constitution.[7] The question then is whether a judgment in this case declaring that these statutes are unconstitutional would result in a substantial likelihood that the video gaming machines would be removed from the Fort Hall Casino.[8]

The Plaintiffs contend that it would. They argue:

Therefore, because the gaming purportedly allowed under the Compact in the instant case is prohibited by Article III §20 of the Idaho Constitution, it is "uncompactable" and prohibited by IGRA. Consequently, the District Court erred in concluding that the supposed peremptory and mandatory terms of the Compact

---

[7] We have not addressed the extent, if any, to which the Idaho Constitution in general or Article III, § 20, in particular may apply to regulate or prohibit the conduct of tribal members within their reservation, or whether a statute applicable only to gambling on an Indian reservation would violate Article III, § 20. In *Nez Perce Tribe v. Cenarrusa*, 125 Idaho 37, 41, 867 P.2d 911, 915 (1993) (emphasis added), we merely stated that "*to the extent* that Indian reservations are governed by the laws of the state of Idaho, they would be subject to the provisions of the gambling amendment." Under IGRA, a state can permit Class III gambling on an Indian reservation that is not permitted in other parts of the state. *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712 (9th Cir. 2003).

[8] We express no opinion on the other requirements of standing.

render speculative the redressability of Knox and Doton's [sic] injuries. If the District Court grants the requested declaratory judgment, the Compact is illegal, void, and a nullity from its inception, and the State would not be bound by its terms allowing the tribal video slot machines.

If, as the District Court and the State maintain, any further litigation with the tribes or other action were required in the event the requested declaratory judgment were granted, the result would be a foregone conclusion. . . . Thus, the requested declaratory judgment would redress Knox and Dotson's injuries because it would void as plainly illegal the tribal gaming Compact, resulting in the video slot machines being *prohibited* by IGRA. (Emphasis in original.)

The Plaintiffs' argument fails to appreciate the conclusive effect of the decision in *Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095 (9th Cir. 2006). "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998). Neither the Plaintiffs nor the State could sue the Tribes without either congressional authorization or the Tribes' consent. "Congress passed the Indian Gaming Regulatory Act in 1988 in order to provide a statutory basis for the operation and regulation of gaming by Indian tribes." *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 48 (1996). "The Indian Gaming Regulatory Act provides that an Indian tribe may conduct certain gaming activities only in conformance with a valid compact between the tribe and the State in which the gaming activities are located." *Id.* at 47. In the Act, Congress waived tribal immunity with respect to "any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under paragraph (3) [of 25 U.S.C. § 2710] that is in effect." 25 U.S.C. § 2710(d)(7)(A)(ii). Congress has not waived tribal immunity with respect to any other lawsuits brought by a state under IGRA, nor has it waived tribal immunity with respect to any lawsuit brought by citizens of a state. In addition, the Plaintiffs assert, "A tribal-state compact is equivalent to a contract." There are only two parties to the Compact at issue in this case: the State and the Tribes. They would both have to be parties to any litigation seeking to void or alter the Compact.

In *Shoshone-Bannock Tribes*, the State of Idaho and the Tribes waived their respective sovereign immunities in order to litigate whether the tribal video gaming at issue in this case is permissible under the Compact. The Compact did not specify the types of Class III gaming that were permitted. It merely provided that "the Tribes may operate in its gaming facilities located on Indian Lands any gaming activity that the State of Idaho 'permits for any purpose by any

18

person, organization, or entity,' as the phrase is interpreted in the context of the Indian Gaming Regulatory Act." Compact, § 4(a). The State contended that tribal video gaming machines were not permitted under the Compact.

The central issue in *Shoshone-Bannock Tribes* was the types of Class III gaming allowed on the Fort Hall Indian Reservation, and specifically whether tribal video gaming machines were permitted. The resolution of that issue was dependent upon the effect that the passage of Proposition One had on the Compact. When referring to the proceedings in the federal district court, the Circuit Court stated, "The voters' approval of Proposition One narrowed the dispute before the district court by clarifying Idaho's public policy regarding tribal video gaming machines." *Id*. at 1098.

In its recitation of relevant facts, the Circuit Court noted:

Proposition One added two sections to the Idaho Code, 67-429B and 67-429C. Section 429B allows "Indian tribes . . . to conduct gaming using tribal video gaming machines pursuant to state-tribal gaming compacts which specifically permit their use." Idaho Code § 67-429B(1). Section 429C authorizes tribes to amend their gaming compacts to permit the use of tribal video gaming machines.
. . . .
Shortly after Proposition One became law, the Coeur d'Alene, Kootenai, and Nez Perce Tribes employed the amendment procedure in Idaho Code section 67-429C(2) to amend their compacts with Idaho by incorporating the terms of 67-429C(1). The amendments granted them the right to operate tribal video gaming machines, subject to the statute's limitations of numbers and requirements of school payments.

465 F.3d at 1097-98. The Court held, "The plain language of section 4 [of the Compact] authorizes the Tribes to operate video gaming machines because Idaho permits three other tribes to operate tribal video gaming machines in the state. . . . The Coeur d'Alene, Kootenai, and the Nez Perce Tribes all legally operate tribal video gaming machines in Idaho pursuant to Idaho Code section 67-429B." *Id*. at 1098-99 (footnote omitted). The Court also held that the Tribes were not bound by Idaho Code § 67-429C. *Id*. at 1102. The Court concluded, "The Tribes are entitled to a mandatory amendment of the Compact stating that they are authorized to conduct tribal video gaming, as the other tribes have been permitted to do." 465 F.3d at 1102.

The Plaintiffs note that in *Shoshone-Bannock Tribes* the State did not raise as an issue the constitutionality of Idaho Code §§ 67-429B and 67-429C. They argue that if those statutes are held unconstitutional, the Defendants would be duty-bound to bring "a declaratory judgment

19

action to have the Class III gaming provisions of the Compact declared void as illegal." They also state, "That it may be necessary for the State to raise this issue in federal district court once the requested declaratory judgment is entered does not somehow render the result 'speculative,' contrary to the District Court's conclusion. Such action by the State and other state officials would essentially be self executing . . . ."

The Compact itself did not specify what types of Class III gaming were permitted on the Fort Hall Reservation. It was the federal court's interpretation of the Compact that did so. The judgment in *Shoshone-Bannock Tribes* is final, and it would be res judicata in any further litigation between the State and the Tribes as to whether the tribal video gaming is permissible. The fact that the State did not raise the constitutionality of sections 67-429B and 67-429C in that case would not prevent res judicata from barring future litigation. Under federal law, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 467 n.6 (1982). As the Supreme Court stated in *Nevada v. U.S.*, 463 U.S. 110, 129-30 (1983) (citations omitted):

> Simply put, the doctrine of *res judicata* provides that when a final judgment has been entered on the merits of a case, "[i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." The final "judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever."

In *Shoshone-Bannock Tribes*, whether or not the Tribes could conduct tribal video gaming was the issue to be decided in the lawsuit. The resolution of that issue was based upon the voters' approval of Proposition One. The assertion that Proposition One was unconstitutional is a legal argument that the State could have made to prohibit tribal video gaming, but it did not make that argument. Even though the State did not raise the constitutionality of Proposition One as an issue, the judgment in *Shoshone-Bannock Tribes* would preclude further litigation between the State and the Tribes as to whether tribal video gaming was permissible under the Compact and whether the Compact is valid under IGRA. Res judicata applies even if the prior judgment "may have been wrong or rested on a legal principle subsequently overruled in another case."

20

*Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981).[9]  A judgment favorable to the Plaintiffs in this case would not permit the State to avoid the application of the doctrine of res judicata.  "There is simply 'no principle of law or equity which sanctions the rejection by a federal court of the salutary principle of *res judicata*.'"  *Id*. at 401.

The Plaintiffs also argue that if these statutes were held unconstitutional in this case, "the federal authorities responsible for prosecuting illegal gambling would do so."  In light of the appellate decision in *Shoshone-Bannock Tribes* holding that tribal video gaming is legal and is permitted by the Compact, there is not a substantial likelihood that such authorities would disregard the decision of the appellate court and seek to commence criminal prosecutions, even if the Plaintiffs prevailed in this action.

The Plaintiffs ask for an award of attorney fees on appeal pursuant to Idaho Code § 12-121.  Because they have not prevailed on appeal, they cannot recover attorney fees under that statute.  *Koch v. Canyon County*, 145 Idaho 158, 163, 177 P.3d 372, 377 (2008).

### III.  CONCLUSION

We affirm the judgment of the district court.  We award costs on appeal to respondents.

Justices BURDICK, J. JONES, W. JONES and HORTON **CONCUR**.

---

[9] Nothing herein should be read as expressing an opinion as to whether Proposition One is unconstitutional or *Idaho v. Shoshone-Bannock Tribes* was wrongly decided.

21